[Cite as *State v. Ramos*, 2016-Ohio-7685.]
[Please see vacated opinion at 2016-Ohio-5835.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 103596**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## HUGO RAMOS

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-589368-A

**BEFORE:** Stewart, J., Jones, A.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** November 10, 2016

**ATTORNEY FOR APPELLANT**

Richard A. Neff
Richard A. Neff Co., L.P.A.
614 West Superior Avenue, Suite 1310
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

Anthony Thomas Miranda
Andrew F. Rogalski
Blaise D. Thomas
Margaret Troia
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

ON RECONSIDERATION[1]

MELODY J. STEWART, J.:

{¶1} After an argument with his wife where he struck her in the head with a brick and strangled her, defendant-appellant Hugo Ramos killed her by stabbing her in her throat, completely severing her carotid artery. He put their three children in his car and drove aimlessly before deciding to kill himself. He stopped the car along a highway and stepped in front of a moving vehicle. The vehicle struck a glancing blow, allowing Ramos to survive. He walked back to his car and set himself on fire. A motorist who had stopped to render assistance used a fire extinguisher to put out the flames, allowing Ramos to again survive. Ramos told a paramedic on the scene that he killed his wife and that he wanted to die. He also wrote a note to an intensive care unit nurse that read "I Kile my wife She four me." And in an interview with the police following his discharge from the hospital, Ramos again stated that he killed his wife.

{¶2} At a jury trial on multiple counts of aggravated murder, kidnapping, felonious assault, domestic violence, and endangering children, Ramos's attorney conceded in opening statement that Ramos "unquestionably and undoubtedly" caused his wife's death. Ramos insisted that he was not criminally responsible, however, because he was insane: he maintained that his relationship with his wife had deteriorated to the point where he

---

[1] The original announcement of decision, *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-5835, released September 15, 2016, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

suffered from severe depression that caused him to turn to heroin for respite, leading to addiction and madness. The jury acquitted Ramos of one count of aggravated murder but found him guilty of the lesser included offense of murder. The jury found Ramos guilty of all other counts charged in the indictment. The court sentenced Ramos to a term of life with parole eligibility after 30 years on the other aggravated murder count and sentenced Ramos to 6-month concurrent terms for three counts of child endangerment, with those terms to run concurrent with the aggravated murder prison term. It merged the remaining counts into the aggravated murder count.

{¶3} In this appeal, Ramos assigns four errors for our review. His first assignment of error raises multiple arguments going to the sufficiency of the evidence.

{¶4} The Due Process Clause of the United States Constitution requires criminal convictions to be based on legally sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence is considered "legally sufficient" if, after viewing the evidence most favorably to the state, "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. This is a quantitative standard of evidence that looks only at whether any rational trier of fact could find that the evidence existed; in other words, did the state offer any evidence going to each essential element of the offense. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). If so, the evidence is legally sufficient for purposes of the Due Process Clause. The sufficiency of the evidence standard requires

great deference to the trier of fact. A reviewing court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011), citing *Jackson* at 326.

{¶5} Ramos argues that the court erred by denying his motion for judgment of acquittal on the offense of aggravated murder as charged under R.C. 2903.01(A)[2] because the state failed to prove he acted with prior calculation and design.

{¶6} R.C. 2903.01(A) states that no person "shall purposely, and with prior calculation and design, cause the death of another." The phrase "prior calculation and design" is not defined by the Revised Code, but indicates "'studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.'" *State v. Powell*, 8th Dist. Cuyahoga No. 99386, 2014-Ohio-2048, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). Instantaneous deliberation is not enough to show prior calculation and design — the defendant must act consistent with "a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).

---

[2] The state argues that this issue is moot because the jury found Ramos not guilty of aggravated murder and guilty of the lesser included offense of murder under R.C. 2903.02(A), which does not contain the element of prior calculation and design. This argument does not take into account that if the court found that the state offered insufficient evidence on the aggravated murder count, Ramos would be entitled to a judgment of acquittal on the count at the close of the state's case-in-chief, thus foreclosing consideration of a lesser included offense at the close of all evidence.

**{¶7}** Ramos maintains that there was no evidence that he acted consistent with a scheme to kill, but that he acted in self-defense. The evidence on this issue consists of statements that Ramos gave to the police when confessing to the crimes and his own trial testimony. Ramos testified that on the day of the murder, he was suffering from heroin withdrawal and heard voices urging him to kill himself.[3] After unsuccessfully trying to hang himself, he told his wife that he wished to go to the hospital. When she refused to take him, they began to argue. A police detective who interviewed Ramos testified that Ramos told him he put his hands around his wife's neck. The wife picked up a brick (or rock, the testimony is unclear) being used for a doorstop and threw it at him, hitting him in the chest. Ramos then threw the brick at his wife, hitting her in the temple. He left the room and went to the kitchen to get a knife. He returned with the knife and stabbed her in the neck three times.

**{¶8}** Although the evidence showed that Ramos and his wife had an encounter that escalated into violence, Ramos's decision to kill the wife was not due to an *instantaneous* event. A rational trier of fact could find that Ramos's act of leaving the room, getting a knife, and returning to the room his wife was in was sufficient to show "studied care" in planning the wife's death. Ramos's act of leaving the room to get the knife created a break in the escalating series of events, showing that his decision to kill went beyond mere momentary deliberation and into the realm of a planned attack. *Taylor* at 19. In

---

[3]The state offered expert testimony to establish Ramos's competency both at the time he committed his crimes and at the time of trial. Competency is not an issue raised on appeal.

this sense, a plan and design to carry out the decision to kill is different from a snap decision to kill. As the argument escalated, Ramos may have spontaneously decided to kill his wife, but his act of leaving the room to get a knife showed deliberate thought in carrying out that decision to kill. *See State v. Hogg*, 10th Dist. Franklin No. 11AP-50, 2011-Ohio-6454, ¶ 19 (evidence that defendant left a confrontation in the front room, went to the kitchen, retrieved a knife, came back to the confrontation in the front room, and ultimately stabbed the victim causing his death sufficient to allow the court to infer the requisite intent to kill). *See also State v. Martin,* 10th Dist. Franklin No. 00AP-836, 2001 Ohio App. LEXIS 1788 (Apr. 19, 2001); *State v. Norman*, 10th Dist. Franklin No. 99AP-398, 1999 Ohio App. LEXIS 6454 (Dec. 23, 1999).

**{¶9}** Ramos concedes that he left the room to get the knife, but claims that he did so in self-defense. Even if the jury could have accepted his self-defense argument, there was no evidence to show that Ramos believed he was under the threat of imminent bodily harm such that he had to use the knife to defend himself.

**{¶10}** Ramos next argues that the state failed to offer sufficient evidence to prove the child endangerment counts. He argues that the only evidence of endangerment was that the children, ages five, three, and one, were kept in the car along the highway as he twice attempted to kill himself, but that the children were not put in a situation of substantial risk to their health or safety.

**{¶11}** As charged in this case, R.C. 2919.21(A) states that no person, who is a parent of a child under 18 years of age, "shall create a substantial risk to the health or

safety of the child[.]" At trial, the state argued that Ramos twice created a substantial risk to the health or safety of the children by (1) allowing them to see him choke and then stab their mother in the throat, and (2) abandoning them by the side of the road as he attempted to kill himself.

{¶12} A rational trier of fact could conclude that Ramos created a substantial risk to the safety and health of the three children by abandoning them in an unlocked car along the side of a four-lane highway with a 65 m.p.h. speed limit. Ramos not only abandoned the children, he took no steps to ensure their safety, leaving them to fend for themselves after he attempted suicide. At the same time, Ramos acted in complete disregard for their emotional well-being by attempting to commit suicide in front of them. Emergency responders testified that they found the children "visibly upset and crying." This was sufficient proof that he created a substantial risk to the safety and health of his children.

{¶13} Ramos's remaining arguments address the sufficiency of the evidence supporting the felonious assault, domestic violence, and kidnapping counts. In our first opinion in this case, we found that the state offered sufficient evidence to prove the felonious assault and domestic violence counts, but found insufficient evidence to support the kidnapping counts. The state filed an application for reconsideration on our resolution of the kidnapping counts; however, we need not address the state's arguments. On reconsideration, we now conclude under existing precedent that we should not have addressed the merits of Ramos's sufficiency of the evidence arguments for any offense

other than murder and child endangerment. Error, if any, with respect to the sufficiency of the evidence on the felonious assault, domestic violence, and kidnapping counts is harmless because those counts were merged into the life sentence imposed for aggravated murder under Count 2.

{¶14} When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless:

> Even if we held the evidence somehow insufficient as to Count Three (charging kidnapping by restraint), it was clearly sufficient as to Count Four (charging kidnapping by removal). Since the trial court merged the kidnapping convictions with one another, Powell received only one sentence for kidnapping, and an erroneous verdict on Count Three would be harmless beyond a reasonable doubt. Thus, a finding of error on Count Three could not affect the sentence. Powell's sixth proposition of law is overruled.

*State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).

{¶15} In *State v. Croom*, 7th Dist. Mahoning No. 12 MA 54, 2013-Ohio-5682, ¶ 60, the Seventh District Court of Appeals stated: "The Supreme Court has concluded that, even if there is insufficient evidence to support one count, where that count has been merged with another count, the error in rendering a verdict on that count is harmless beyond a reasonable doubt." This court, too, has applied *Powell* to find that any issues concerning the weight of the evidence with respect to a count that was merged into another count for sentencing to be harmless error because the final sentence would not be

affected by any review of the evidence underlying the merged counts. *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23.

**{¶16}** In addition to the *Powell* line of cases, a second line of thought has developed, set forth in *State v. Obsaint*, 1st Dist. Hamilton No. C-060629, 2007-Ohio-2661, holding that if a sentence for an allied offense was merged into another sentence, the defendant was not actually "convicted" of the allied offense. A "conviction" requires both a finding of guilt and a sentence, *State v. Henderson*, 58 Ohio St.2d 171, 178, 389 N.E.2d 494 (1979), so if defendant did not receive a sentence on an allied offense, there was no conviction to review for error. *Obsaint* at ¶ 24. *See also State v. Payne*, 11th Dist. Ashtabula No. 2014-A-0001, 2014-Ohio-4304, ¶ 17; *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241; *State v. Singleton*, 8th Dist. Cuyahoga No. 103478, 2016-Ohio-4696, ¶ 37.

**{¶17}** We confess to some unease over these holdings: the Supreme Court has held that "[b]ecause R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 27. This could become an issue if, at some point after appeal, the count into which the allied offense was merged is vacated. Suppose facts similar to this case but the aggravated murder conviction is vacated post-appeal — what would happen to the allied offenses that were merged for sentencing? If the defendant was not sentenced on them, he was technically

not "convicted" of those offenses. Would those offenses just disappear? Or would the defendant be subject to sentencing on the remaining counts, having been denied the opportunity to contest the sufficiency of the evidence? It might be that the defendant would have the opportunity to appeal any conviction that stemmed from the imposition of a sentence for one or more offenses of which the defendant was found guilty, but merged.

{¶18} These are questions that we do not have to answer here. For purposes of this appeal, our conclusion that the state offered legally sufficient evidence to prove the aggravated murder conviction renders our hypothetical moot. On that basis, we find that any claimed error relating to the weight or the sufficiency of the evidence going to counts that merged into the murder count to be harmless beyond any doubt.

{¶19} Ramos next argues that his convictions were against the manifest weight of the evidence, but the only issue that he separately argues as required by App.R. 12(A)(2) and 16(A)(7), is that he proved by a preponderance of the evidence that he was not guilty of aggravated murder by reason of insanity.

{¶20} The manifest weight of the evidence standard requires the reviewing court to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986). This is a difficult burden for an appellant to overcome because the trier of fact has the sole responsibility to resolve factual issues.

*State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The deference we give to the resolution of factual issues is underscored by our recognition that the trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). While it has been said that the weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other," *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, the use of the word "greater" does not imply a simple balancing of the evidence such that the tipping of the scale in the appellant's favor will result in the reversal of a conviction. The standard of review uses the word "manifest," indicating that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence.

**{¶21}** R.C. 2901.01(A)(14) states:

A person is "not guilty by reason of insanity" relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.

**{¶22}** An insanity defense "does not permit individuals who know what is legally wrong to eschew the law." *State v. Jennings*, 10th Dist. Franklin No. 05AP-1051, 2006-Ohio-3704, ¶ 24. For this reason, a defendant suffering from mental illness cannot avoid criminal responsibility if he knows his conduct "violates the law and commonly

held notions of morality." *Id.* at ¶ 22, citing *People v. MacDowell*, 133 Misc.2d 944, 948, 508 N.Y.S.2d 870 (Sup.Ct.1986).

{¶23} Although there was significant evidence to show that Ramos suffered from major depressive disorder with "congruent psychotic features" (he heard voices urging him to take his own life), the evidence regarding his lack of knowledge of the wrongfulness of his acts was far less compelling.

{¶24} One of the state's experts said that it "was not a close call" as to Ramos's ability to appreciate the wrongfulness of his acts. In seeming contradiction to his statement that he "blacked out" while killing his wife, Ramos had the presence of mind to cover his wife's body with clothes before leaving the house. By hiding the body from view, Ramos indicated that he knew he did something wrong.

{¶25} Other evidence showing Ramos's knowledge of his wrongdoing was that he told the police that he had done "something wrong." This statement demonstrated his conscious knowledge that his act of killing his wife was wrong. And in a note he wrote at the hospital, he not only admitted to killing his wife, but said that he did so because she "four" me — later telling a psychiatrist that the word "four" meant to say that "she f***ed my life, she messed up my life." A psychiatrist testifying for the state concluded that Ramos's anger with his wife provided a "rational motive" for him to kill, belying his claim that he did not know the wrongfulness of his acts.

{¶26} In support of his insanity argument, Ramos relies on the report of his expert, but does so for reasons that are unclear. His expert was "unable to reach an opinion with

a reasonable medical certainty regarding Mr. Ramos's knowledge of wrongfulness * * *."

Ramos had the burden of proving that he was not guilty by reason of insanity, so the third expert's report is of no use to him because it reached no conclusions. This meant that the state's experts were unrefuted. The third expert provided nothing to weigh against the opinions from the state's experts. Having failed to offer competent, credible evidence in support of his burden to prove that he was insane at the time he committed his crimes, Ramos cannot show that the jury's rejection of his insanity defense was against the manifest weight of the evidence.

**{¶27}** In its instructions to the jury at the close of trial, the court said that testimony had been admitted indicating that Ramos fled the scene and that although evidence of flight did not raise a presumption of guilt, the jury could consider evidence of flight as indicating Ramos's "consciousness of guilt." Ramos complains that there was no evidence that he fled his home in order to avoid apprehension; rather, he claims the evidence showed that left the home in order to kill himself.

**{¶28}** Flight from justice "means some escape or affirmative attempt to avoid apprehension." *State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19. Flight is more than merely leaving the scene of a crime — it would be unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension. *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30. Flight in this context requires the defendant to appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found. The trier of fact

may infer that such circumstances show that the defendant is avoiding the police only because he knows that he is guilty and wishes to avoid the inevitable consequences of his crime. The court has discretion to decide whether to issue an instruction on flight. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 48. A trial court does not abuse its discretion by issuing an instruction on flight if sufficient evidence exists in the record to support the charge. *Id*. at ¶ 49.

**{¶29}** Ramos showed a consciousness of guilt after killing his wife — he twice tried to commit suicide, he begged emergency responders to "let me die" in conjunction with admitting that he killed his wife, and he told a police detective that he did "something wrong." But this consciousness of guilt was not made in active flight from law enforcement. At the time he left the crime scene, Ramos had no reason to believe that the police were actively seeking him. The evidence showed only that Ramos left a crime scene, not that he was actively fleeing to avoid apprehension. The court abused its discretion by giving a flight instruction.

**{¶30}** The error in giving the flight instruction, however, was harmless beyond any doubt. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). Ramos conceded that he killed his wife, albeit because he did not appreciate the wrongfulness of his acts. As we earlier detailed, Ramos failed to carry his burden of proof on his claim that he was not guilty by reason of insanity — the person he held out as an expert for the defense testified that she was unable to given an opinion regarding Ramos's sanity. Against that non-opinion was

evidence from two state experts concluding that Ramos appreciated the wrongfulness of his acts. Ramos would have been convicted even if the court did not give a flight instruction.

{¶31} Ramos's final argument is that the court abused its discretion by refusing to grant a mistrial after a police detective testified that the wife sought refuge at a women's shelter due to domestic violence. He maintains that this was other acts evidence admitted in violation of Evid.R. 404(B).

{¶32} Before trial, Ramos made a motion in limine asking the court to exclude any evidence that the wife and children had lived in a "women's shelter" in Rhode Island. Ramos argued that there was no evidence that he committed any acts of domestic abuse against her. The state agreed that it had no evidence of domestic violence and told the court that it was "undecided" as to whether it would seek to offer evidence that the wife had stayed in a women's shelter. It did tell the court, however, that it believed that it could "show a pattern of domestic violence that resulted in a domestic homicide[.]" The court held Ramos's motion to exclude the evidence in abeyance until the state desired to offer the evidence, requesting that the state give the court some notice before it sought to use the evidence.

{¶33} Despite seeking to exclude any evidence regarding the women's shelter, defense counsel mentioned the women's shelter in opening statement, telling the jury that the wife went to Rhode Island to "check in at a woman's shelter, a shelter where she could get help in finding housing, subsidized housing, where she could get connected to

various agencies to give her government benefits, to which she was intended [sic]." During direct examination, the police detective testified that in his interview with Ramos, Ramos told him that the wife and children lived in a Rhode Island "shelter" for a few months before moving to Cleveland. The detective also testified that he asked Ramos whether he and his wife had "any kind of issues of domestic violence[.]" Ramos denied that either he or his wife had hit the other.

{¶34} On cross-examination of the detective, defense counsel's first question was whether the detective checked police records to determine if Ramos had physically abused his wife. The detective replied that the Cleveland Police Department had no record of Ramos having done so. The detective testified that he checked in other jurisdictions where Ramos lived (New York City and Rhode Island) and could find no reports that Ramos physically abused his wife.

{¶35} On redirect examination of the detective, the state referenced defense counsel's questions about whether there were any domestic violence reports from New York and asked, "Did you learn at some point about any domestic violence history in Rhode Island, specifically with regard to a domestic violence shelter?" Over objection, the detective answered, "I think she went to a shelter with the kids and may have reported some domestic abuse." At sidebar, the state told the court that after the ruling on the motion in limine, it obtained two documents prepared by the women's shelter in Rhode Island indicating that the wife and children "came to our shelter because they were involuntarily displaced as a result of domestic violence and in need of a safe place to

stay." Defense counsel objected on the basis that the documents did not contain any direct statements from the wife indicating that Ramos had struck her.

{¶36} Granting a mistrial is an extraordinary remedy for an error. For that reason, "a mistrial should not be ordered in a cause simply because some error has intervened. The error must prejudicially affect the merits of the case and the substantial rights of one or both of the parties." *Tingue v. State*, 90 Ohio St. 368, 108 N.E. 222 (1914), syllabus. Indeed, "[m]istrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). We review a decision to grant or deny a mistrial for an abuse of discretion. *State v. Glover*, 35 Ohio St.3d 18, 21, 517 N.E.2d 900 (1988).

{¶37} The record in this case does not permit us to conclude that the court acted irrationally by finding that the ends of justice did not require a new trial. The defense first mentioned that the wife and children stayed in a "woman's shelter." Opening statements at trial are not evidence, *Parrish v. Jones*, 138 Ohio St.3d 23, 2013-Ohio-5224, 3 N.E.3d 155, ¶ 29, nevertheless, it was Ramos who set the stage for evidence about the women's shelter. When the detective testified that Ramos mentioned in his statement that his wife and children stayed in a women's shelter in Rhode Island, that testimony was unobjectionable because the detective learned that fact directly from Ramos. It was at that point that defense counsel specifically asked the detective whether there were any records to substantiate a claim that Ramos physically abused the wife. That question allowed the state to introduce documents from the women's shelter that

indicated that the wife and children came to the shelter "as a result of domestic violence and in need of a safe place to stay." Having specifically asked whether there were any "records" of Ramos's history of domestic violence, the defense could not complain when the state later produced those records.

**{¶38}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MELODY J. STEWART, JUDGE

LARRY A. JONES, SR., A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR