[Cite as *State v. Marshall*, 2025-Ohio-5760.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 115046 |
| v. | : | |
| CURTIS MARSHALL, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 24, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-24-695542-A and CR-25-698233-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Sean Drake, Assistant Prosecuting Attorney, *for appellee.*

Eric M. Levy, *for appellant.*

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant Curtis Marshall ("Marshall") appeals from his convictions and sentence in two separate criminal cases. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} The instant appeal arises from two separate criminal cases that were tried together. On October 1, 2024, in Cuyahoga C.P. No. CR-24-695542-A, a Cuyahoga County Grand Jury indicted Marshall on one count of aggravated burglary in violation of R.C. 2911.11(A)(1); one count of aggravated robbery in violation of R.C. 2911.01(A)(1); one count of robbery in violation of R.C. 2911.02(A)(2); one count of felonious assault in violation of R.C. 2903.11(A)(2); one count of strangulation in violation of R.C. 2903.18(B)(2); one count of strangulation in violation of R.C. 2903.18(B)(3); one count of disrupting-public-services in violation of R.C. 2909.04(A)(1); and one count of aggravating menacing in violation of R.C. 2903.21(A). With the exception of the disrupting-public-services and aggravated-menacing charges, each count carried one- and three-year firearm specifications. These charges arose from events that allegedly occurred on August 2 and 3, 2024.

{¶ 3} On January 2, 2025, in Cuyahoga C.P. No. CR-25-698233-A, a Cuyahoga County Grand Jury indicted Marshall on one count of intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04(B)(1) and one count of telecommunications harassment in violation of R.C. 2917.21(A)(1). These charges arose from conduct that allegedly occurred between September 2, 2024, and October 30, 2024.

{¶ 4} On February 21, 2025, the State filed a motion for joinder of the two cases for trial. On February 23, 2025, Marshall filed a motion for separate trials. On

March 4, 2025, the court held a hearing on these motions and ultimately granted the State's motion for joinder and denied Marshall's motion for separate trials.

{¶ 5} The cases proceeded to a jury trial on March 10, 2025.

{¶ 6} The State called B.F., who testified that she grew up with Marshall and had an intimate relationship with him for about three months. B.F. testified that she had broken up with Marshall about a week prior to the August 2, 2024 incident, but "[Marshall] didn't want to accept that." (Tr. 149).

{¶ 7} B.F. testified that around 9 p.m. on August 2, 2024, she was sitting on the front porch of her home in Cleveland, Ohio. B.F. testified that she was having a drink and listening to music and that Marshall was coming to her house to fix her car because he had experience doing so. B.F. testified that when Marshall arrived, he appeared intoxicated because he was staggering, had glossy eyes, and "smelled like a funeral home." (Tr. 152). B.F. opined that Marshall was not trying to fix her car because he did not bring any tools with him. At that point, according to B.F., her brother J.F. came over and asked Marshall what he was doing. Specifically, B.F. testified that J.F. went to look at her car, and when he came back to the porch, he told Marshall that "they should fight about what he had [done.]" (Tr. 154). At that point, according to B.F., Marshall pulled out two firearms, put one up to his head and the other up to his neck, sat down, and said that he would kill himself if he had to fight J.F.

{¶ 8} B.F. testified that she went inside through her side door and came back outside through her front door, at which point she heard Marshall and J.F.

having a conversation. B.F. thought that J.F. was telling Marshall to stay away from her home and Marshall agreed. B.F. then observed Marshall walking down the street and thought that he left. According to B.F., she said goodbye to her brother, locked her front door, and walked back to her kitchen, where she encountered Marshall. B.F. testified that while she thought Marshall was leaving, he entered her home without her permission through the side door. B.F. testified that Marshall hit her in the face and head repeatedly with her own firearm, which she had recently put on her kitchen counter. B.F. testified that Marshall then grabbed her by the neck and threw her onto her couch, where he continued beating her. According to B.F., Marshall dragged her by her hair to the bathroom, where he pushed her into the bathtub. While she was in the bathtub, Marshall got into the bathtub, put his knee on her chin, and started pressing down on her while continuing to hit her in the head with the firearm. B.F. testified that Marshall then put the firearm into her mouth, pulled her out of the bathtub, and asked her if she wanted to see him hurt. According to B.F., she told Marshall repeatedly "no, I don't ever want to see you hurt, I love you, but you wrong." (Tr. 158.)

{¶ 9} B.F. testified that Marshall again hit her into the bathtub, but this time, the firearm went off and a bullet "ricocheted around the bathtub and grazed [her] behind [her] ear, and [Marshall] said, 'I didn't mean to hit you like that.'" (Tr. 159.)

{¶ 10} B.F. testified that her doorbell rang and Marshall told her to clean herself up. Marshall then went to answer the door; Marshall's friend was outside.

According to B.F., she took that opportunity to go to the bedroom at the back of the house, get a pair of shoes, and jump out of her bedroom window to get away from Marshall. B.F. went to a neighbor's house one street away from her house, and her neighbor called an ambulance because B.F. was bleeding. B.F. testified that when the ambulance arrived, she refused to go to the hospital in the ambulance because the doors of her house were still open.

{¶ 11} B.F. testified that she did not have a phone because Marshall had taken her phone before beating her; she testified that she used her neighbor's phone to call the police early the next morning.

{¶ 12} The State introduced numerous photographs that law enforcement and B.F. took of her injuries; B.F. confirmed that the photographs depicted her injuries. B.F. testified that some of the marks on her neck depicted in the photographs had become permanent, and she showed those marks at trial.

{¶ 13} B.F. testified that about a week after the incident, Marshall returned to her house. According to B.F., she was leaving her house in the evening when she saw Marshall emerge from her backyard carrying a firearm. Marshall made a remark about B.F. calling the police on him; B.F. was confused until she realized that at that moment, the police were conducting a wellness check on her and approaching her house. B.F. testified that Marshall fled through her backyard, and after that, the only contact she had with Marshall was over the phone.

{¶ 14} Specifically, B.F. testified that Marshall called her numerous times threatening her if she went to court. B.F. also testified that three women called her

and came to her home, "threatening to kill me if I came to court and/or if I pressed charges to [Marshall,]" and that Marshall told her that he sent these women to her. (Tr. 177.)

{¶ 15} The State also called J.F., who testified that on August 2, 2024, B.F. called him and told him that she was having some issues with Marshall and Marshall would not leave her house. J.F. testified that when he arrived at B.F.'s house, he found B.F. and Marshall sitting on the front porch. J.F. testified that the situation was awkward, and Marshall seemed to be "pleading his case" regarding his breakup with B.F. (Tr. 211.) J.F. testified that Marshall had two firearms on him, and at one point, he pointed the firearms at himself and threatened to kill himself. J.F. attempted to diffuse the situation; according to J.F., he told B.F. to go into the house and she did so. J.F. testified that once B.F. was safely inside, he left; Marshall was still on the porch when J.F. left.

{¶ 16} The State called Ashondre Welch ("Welch"), who testified that he was a patrol officer with the Cleveland Division of Police ("CDP"). Welch testified that on August 3, 2024, he responded to a call at B.F.'s house and met with B.F.. Welch testified that through his investigation, he learned that B.F. had recently been assaulted by her ex-boyfriend, Marshall. Welch testified that B.F. reported the theft of her firearm and cellphone. Welch testified that he had taken some of the photos the State had previously introduced showing B.F.'s injuries. He testified that he asked B.F. if she needed medical treatment and she declined. Welch testified that

he confirmed that B.F. felt safe at her home, told her that a detective would follow up with her, and left the house.

{¶ 17} The State called William Fien ("Fien"), who testified that he was a detective with CDP and was assigned B.F.'s case. Fien testified that at around 7:30 a.m. on August 3, 2024, he called the phone number listed for B.F. in Welch's police report; Fien testified that a man answered the phone, and when Fien asked for B.F., the man told him he had the wrong number and quickly hung up the phone. Fien testified that he reviewed the dispatch notes and realized that the 911 call was made from a neighbor; he went to interview the neighbor and confirmed that the neighbor made the 911 call, but they did not wish to be involved in the investigation.

{¶ 18} Fien testified that based on his investigation, he issued an arrest warrant for Marshall. Fien also testified that after his initial interview with B.F., she contacted Fien to inform him that she had made a report based on intimidating text messages she had received from Marshall. Fien instructed B.F. to forward the text messages to him.

{¶ 19} At the close of the State's case, it dismissed the disrupting-public-services charge. Marshall made a Crim.R. 29 motion for acquittal on the remaining counts; the trial court denied this motion. Marshall then rested without testifying or presenting any additional evidence or witnesses. Marshall renewed his Crim.R. 29 motion, and the trial court denied this motion.

{¶ 20} On March 12, 2025, the jury returned a verdict of guilty of all counts and specifications.

{¶ 21} On March 25, 2025, the court held a sentencing hearing. For purposes of sentencing, the court and the parties agreed that the aggravated-robbery and robbery charges would merge, that the two counts of strangulation would merge, and that the intimidation and telecommunications-harassment charges would merge. Marshall, his counsel, and the assistant prosecuting attorney all addressed the court.

{¶ 22} The court sentenced Marshall to four to six years on the aggravated-burglary charge, to run consecutively to the corresponding three-year firearm specification; four years on the aggravated-robbery charge, to run consecutively to the corresponding three-year firearm specification; four years on the felonious-assault charge, to run consecutively to the corresponding three-year firearm specification; three years on the strangulation charge, to run consecutively to the corresponding three-year firearm specification; and three years on the intimidation charge. The court ordered the sentences on the underlying charges to be served concurrently to each other and ordered the sentences on two of the firearm specifications to be served consecutively to each other, for a total aggregate sentence of 10 to 12 years.

{¶ 23} Marshall appeals, raising the following four assignments of error, verbatim, for our review:

> I. The trial court abused its discretion when it joined for trial CR-24-695542-A, the underlying offenses; and CR-25-698233-A, the separate allegations for intimidation and telecommunications harassment of B.F. the alleged victim in the underlying offense which prejudiced appellant Marshall.

II. Appellant's conviction(s) were entered absent sufficient evidence and violated his rights as provided by the United States and Ohio constitutions.

III. Appellant's conviction(s) are against the weight of the evidence.

IV. [Appellant] received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution where counsel did not request a sanity evaluation.

## Law and Analysis

### I. Joinder

{¶ 24} In his first assignment of error, Marshall argues that the trial court abused its discretion when it granted the State's motion to join the two separate cases for trial. Specifically, Marshall argues that the offenses in the two cases are distinct in nature and temporal proximity, and further, Marshall suffered substantial prejudice by the joinder of the two cases.

{¶ 25} We review the trial court's ruling on joinder for an abuse of discretion. *State v. Woods*, 2024-Ohio-467, ¶ 21 (8th Dist.), citing *State v. Dean*, 2015-Ohio-4347, ¶ 58. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way over a matter in which it has discretionary authority. *Id.*, citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse of discretion 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Id.*, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 26} Crim.R. 13 provides that "[t]he court may order two or more indictments or informations or both to be tried together, if the offenses or the

defendants could have been joined in a single indictment or information." Likewise, Crim.R. 8(A) provides:

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶ 27} The law generally favors joinder of multiple offenses in a single trial under Crim.R. 8(A) ""'if the offenses charged are of the same or similar character.'"" *Woods* at ¶ 23, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting Crim.R. 8. However, Crim.R. 14 requires separate trials when joinder would result in prejudice. *Id*. at ¶ 24.

{¶ 28} Marshall bears the burden of affirmatively showing that his rights were prejudiced by the joinder here. *Id*. at ¶ 25, citing *State v. Gordon*, 2018-Ohio-259, ¶ 21, citing *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. Thus, to prevail on a claim that the trial court erred in joining his cases, Marshall must affirmatively demonstrate that (1) his rights were prejudiced; and (2) at the time of the motion to sever, he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial; and (3) given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *Id*., citing *State v. Schaim*, 65 Ohio St.3d 51 (1992).

{¶ 29} The Ohio Supreme Court has explained that there are two ways that the State may rebut a defendant's claim of prejudicial joinder:

> First, if in separate trials the [S]tate could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder. Second, the [S]tate can refute prejudice by showing that "evidence of each crime joined at trial is simple and direct."

*State v. Diar*, 2008-Ohio-6266, ¶ 96, citing *Lott*. "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Schaim* at 59, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir. 1964).

{¶ 30} Marshall argues that he was prejudiced here because he was denied an opportunity to testify in one case and not the other and joinder therefore denied him his right to remain silent. He further argues that because of the complex nature of the issues, the jury was incapable of distinguishing the proof on multiple charges because the evidence presented as to each charge was complex. Finally, he argues that he was prejudiced by the "spillover effect" where the jury likely inferred that Marshall was guilty of the aggravated-burglary and related charges by virtue of the intimidation charges. Even if we were persuaded by Marshall's argument that he was prejudiced, this argument is easily rebutted.

{¶ 31} Here, in the first case, Marshall secretly entered B.F.'s home, stole her firearm and cellphone, and proceeded to brutally assault her. In the second case, Marshall repeatedly communicated with B.F. by phone and threatened more violence if she pursued criminal charges against him related to the first case. Because Marshall's attempts to intimidate B.F. from testifying regarding the

aggravated burglary connects that case to the intimidation case, and the two cases together form a course of criminal conduct, they were properly joined pursuant to Crim.R. 8(A) and 13. *State v. Gordon*, 2018-Ohio-259, ¶ 19.

{¶ 32} Further, because "'[e]vidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt[,]'" the evidence related to the intimidation case would have been admissible in a separate trial on the aggravated burglary incident. *Gordon* at ¶ 28, quoting *State v. Conway*, 2006-Ohio-2815, ¶ 68. Similarly, the evidence regarding the underlying aggravated-burglary incident would have been admissible in a separate trial on intimidation because B.F. was the victim and a material witness in both cases.

{¶ 33} Therefore, the trial court did not abuse its discretion in joining the two cases for trial. Marshall's first assignment of error is overruled.

## II. Sufficiency of the Evidence

{¶ 34} In Marshall's second assignment of error, he argues that his convictions were not supported by sufficient evidence. Specifically, he argues that there was insufficient evidence to establish that he entered B.F.'s home by force, stealth, or deception, as required to sustain his aggravated burglary conviction. He also argues that there was insufficient evidence showing that he used or brandished a firearm as required to sustain his aggravated robbery conviction. Marshall also argues that there was insufficient evidence to support his intimidation conviction because the State failed to present evidence that Marshall attempted to influence or intimidate B.F. by an unlawful threat of harm.

{¶ 35} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 36} With a sufficiency inquiry, an appellate court does not review whether the prosecution's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 36 (Cook, J., concurring). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at ¶ 23. Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.).

{¶ 37} With respect to his aggravated-burglary conviction, the State was required to prove that Marshall, "by force, stealth, or deception" trespassed in an occupied structure with purpose to commit a criminal offense. R.C. 2911.11(A)(1). Marshall argues that the State presented insufficient evidence to establish that he entered B.F.'s house by force, stealth, or deception, and in the absence of any evidence as to how Marshall entered the house, the State failed to meet its burden.

{¶ 38} In the context of aggravated burglary, "stealth" has been defined as "any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission." *State v. Bolden*, 2016-Ohio-8488, ¶ 14 (8th Dist.), quoting *State v. Lane*, 50 Ohio App.2d 41, 47 (10th Dist. 1976).

{¶ 39} The evidence presented at trial was that Marshall snuck into B.F.'s closed, unlocked side door without knocking or otherwise announcing his presence, after B.F. thought that Marshall had left her property. B.F. testified as to Marshall's behavior, explaining that when Marshall first arrived at her house to fix her car, he "came out of the backyard like sneaky as far as like he parked on the street behind me and came though my backyard like not trying to make me aware that he was really coming over." (Tr. 153.) She also testified that immediately before he entered her house without her permission, B.F. saw Marshall walk down the street as though he was leaving. Viewing the evidence in the light most favorable to the State, the evidence presented could support that Marshall entered B.F.'s home by stealth.

{¶ 40} With respect to his aggravated-robbery conviction, Marshall was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that

> [n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it. . . .

{¶ 41} Marshall does not dispute that he committed a theft offense. Rather, he argues that the fact that he stole a firearm does not automatically satisfy the element of displaying, brandishing, indicating that he possessed, or using the firearm required to sustain his conviction. We disagree.

{¶ 42} The evidence reflects that upon entering B.F.'s home without permission, he stole her firearm and cellphone and, moments later, proceeded to brutally assault B.F. when she encountered him in her kitchen. The assault took place while Marshall was committing the theft offense; in fact, the evidence reflects that the assault was largely committed with the very firearm that was taken as part of the theft offense.

{¶ 43} Marshall argues that the theft offense was completed before the assault began, and moreover, he could not have been attempting to flee because he invited a friend to B.F.'s house. These arguments are unpersuasive. With respect to the timing, the fact that Marshall was still in B.F.'s house and B.F. had discovered him in the process of stealing her firearm and cellphone undermines Marshall's position that the theft offense was completed. Further, while the evidence reflects that Marshall invited a friend to B.F.'s house, the evidence also reflects that Marshall seriously harmed B.F. and likely would have further harmed her had she not taken the opportunity to escape when the friend arrived. Marshall's argument that he did not flee is undermined by the fact that he did ultimately leave B.F.'s house after B.F. escaped. The fact that B.F. fled the scene before Marshall does not mean that his conviction was supported by insufficient evidence. While B.F. fled the scene before

Marshall, the fact that Marshall used the firearm to assault B.F. before he left the scene indicates that he used the firearm in the commission of the theft offense.

{¶ 44} Marshall makes the same argument to assert that the attendant firearm specification was not supported by sufficient evidence. Pursuant to R.C. 2941.145, conviction on the three-year firearm specification required the State to prove that Marshall displayed, brandished, indicated that he possessed the firearm, or used the firearm to facilitate the offense. As discussed above, the evidence shows that Marshall assaulted B.F. with the stolen firearm before leaving her house with the firearm. Further, while Marshall argues that there is insufficient evidence showing that the firearm was operable, the evidence reflects that the firearm went off while Marshall was assaulting B.F. in the bathtub; this is sufficient to establish that the firearm was operable. Therefore, the aggravated-robbery conviction was supported by sufficient evidence.[1]

{¶ 45} Finally, with respect to the intimidation conviction, the State was required to prove that Marshall "knowingly and by force or by unlawful threat of force" attempted to influence or intimidate B.F. related to the underlying criminal proceedings. R.C. 2921.04(B)(1). Marshall argues that there was insufficient

---

[1] Marshall also argues that his robbery offense, which merged with the aggravated-robbery conviction for sentencing, was supported by insufficient evidence for the same reasons. This court has previously found that if there is sufficient evidence to support the offense on which the court sentenced the defendant, a reviewing court need not consider the sufficiency of the evidence or manifest weight of the evidence on the merged counts because any error would constitute harmless error. *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990), and *Ramos* at ¶ 15, citing *State v. Worley*, 2016-Ohio-2722, ¶ 23 (8th Dist.). Therefore, we need not consider Marshall's arguments related to his robbery conviction.

evidence that he made any "unlawful threat of harm" to B.F.. Specifically, Marshall argues that the State failed to prove this element because it did not introduce any of the text messages or audio recordings of the phone calls that he allegedly made to B.F. in which he allegedly threatened harm.

{¶ 46} An "unlawful threat of harm" requires more than just a threat and is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law. *State v. Kilton*, 2019-Ohio-87, ¶ 9 (8th Dist.), citing *State v. Cress*, 2006-Ohio-6501, ¶ 41-42. B.F. testified that after the August 2 incident, Marshall came to her house and emerged from her backyard carrying a firearm and asking why she called the police. She also testified that Marshall called her numerous times and threatened violence against her if she came to court. B.F. testified further that additional people contacted her and came to her house threatening violence against her if she proceeded to testify against Marshall, and Marshall himself told her that he instructed these people to do so. This evidence satisfies the element of "unlawful threat of harm." The fact that the State did not introduce text messages or phone calls at trial does not mean that there was insufficient evidence supporting Marshall's intimidation conviction. "[T]he testimony of 'one witness, if believed by the jury, is enough to support a conviction.'" *State v. Buchanan*, 2018-Ohio-1086, ¶ 22 (8th Dist.), quoting *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.). B.F.'s testimony, which included a discussion of the text messages and phone calls at issue, was therefore sufficient to support Marshall's

conviction. Thus, there was sufficient evidence supporting Marshall's intimidation conviction.

{¶ 47} Marshall's second assignment of error is overruled.

**III. Manifest Weight**

{¶ 48} In Marshall's third assignment of error, he argues that his convictions were against the manifest weight of the evidence. Specifically, Marshall argues that B.F.'s testimony was the "only" evidence used to convict him and her testimony was so unreliable that it warrants reversal of his convictions. Marshall argues that B.F.'s timeline and account of events varied greatly from that of J.F., and additionally, that B.F. did not tell either Welch or Fien that she was grazed by a bullet when her stolen firearm went off while Marshall was assaulting her in the bathtub.

{¶ 49} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, 1997-Ohio-52, ¶ 24.

{¶ 50} In a manifest-weight-of-the-evidence challenge, sitting as the "thirteenth juror," the court "looks at the entire record and '"weights the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."'" *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *Thompkins* at

¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Further, reviewing courts will vacate a verdict and order a new trial "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at ¶ 31.

{¶ 51} As an initial matter, we note that while B.F.'s testimony was perhaps the most significant evidence against Marshall, it was far from the only evidence presented by the State. The State also presented evidence from other individuals, including multiple law enforcement officers that largely corroborated B.F.'s story. Moreover, the State presented numerous photographs depicting B.F.'s injuries as well as testimony from law enforcement that the injuries depicted corresponded with the assault B.F. described.

{¶ 52} While B.F. and J.F.'s testimony had minor inconsistencies, these are not sufficient to call B.F.'s credibility into question. B.F.'s testimony was largely corroborated by testimony from J.F. and other witnesses, as well as by the photographs documenting her injuries.

{¶ 53} Further, much of Marshall's argument that his convictions were against the manifest weight of the evidence centers on evidence that could or should have been presented, such as text messages and phone calls and a spent shell casing from the bathroom. "Courts have repeatedly held that a lack of physical evidence, standing alone, does not render a conviction against the manifest weight of the evidence." *State v. Abudu*, 2023-Ohio-2294, ¶ 67 (8th Dist.), citing *State v. Conner*, 2013-Ohio-2773, ¶ 12 (10th Dist.), citing *State v. Berry*, 2011-Ohio-6452, ¶ 20 (10th

Dist.). Thus, the fact that Marshall alleges that there was a dearth of significant evidence does not render his convictions against the manifest weight of the evidence.

{¶ 54} After a thorough review of the record, we cannot say that this is the exceptional case where the evidence weighed heavily against the convictions and the jury clearly lost its way and created a manifest miscarriage of justice. Therefore, Marshall's third assignment of error is overruled.

## V. Ineffective Assistance of Counsel

{¶ 55} In Marshall's fourth assignment of error, he argues that he received ineffective assistance of counsel when his counsel failed to request a sanity evaluation.

{¶ 56} To establish ineffective assistance of counsel, Marshall must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 2000-Ohio-448, ¶ 49, citing *Strickland* at 697.

{¶ 57} Marshall argues that the record in this case contains significant testimony that should have prompted a reasonable attorney to investigate Marshall's mental state and consider a sanity evaluation. Specifically, Marshall points to testimony from B.F. and J.F. that Marshall was not acting like himself and threatened to kill himself.

{¶ 58} Generally, a trial counsel's failure to seek a competency evaluation or to pursue an insanity defense is not, per se, ineffective assistance of counsel. *State v. Eley*, 2001-Ohio-3447 (7th Dist.), citing *State v. Decker*, 28 Ohio St.3d 137 (1986). Specifically, there are numerous tactical reasons a defense attorney would not seek an evaluation based upon competency or sanity. *Id.*, quoting *State v. Wilkins*, 1996 Ohio App. LEXIS 3800 (5th Dist. Aug. 5, 1996).

{¶ 59} Questionable trial strategies and tactics do not rise to the level of ineffective assistance of counsel. *State v. Mohamed*, 2017-Ohio-7468, ¶ 18, citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). Further, "[s]imply because there was 'another and better strategy available' did not mean that counsel provided ineffective assistance." *Id.*, quoting *Clayton* at 49.

{¶ 60} Thus, Marshall has not shown here that his trial counsel's failure to request a sanity evaluation — on the basis of several comments about his strange behavior — fell below an objective standard of reasonableness so as to be deficient. Because Marshall has not satisfied the first prong of the *Strickland* test, he has failed to establish that he received ineffective assistance of counsel. Therefore, Marshall's fourth assignment of error is overruled.

{¶ 61} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

WILLIAM A. KLATT, JUDGE*

EMANUELLA D. GROVES, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)