[Cite as *State v. Hall,* 2026-Ohio-1042.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| MARK HALL, | : | |
| | | No. 115264 |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 26, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-695031-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lisa J. Turoso and Melissa Riley, Assistant Prosecuting Attorneys, *for appellee.*

Eric M. Levy, *for appellant.*

TIMOTHY W. CLARY, J.:

{¶ 1} Defendant-appellant Mark Hall ("Hall") appeals from his convictions and sentence following a jury trial. For the following reasons, we affirm.

## I. Factual and Procedural History

{¶ 2} On September 10, 2024, a Cuyahoga County Grand Jury indicted Hall on ten counts for the alleged rape, attempted rape, kidnapping, felonious assault, and strangulation of M.A. and for allegedly operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of them ("OVI"). Several of the charges included repeat-violent-offender ("RVO") specifications, sexually violent predator ("SVP") specifications, and notice-of-prior-conviction ("NPC") specifications, and one count of strangulation included a furthermore clause.

{¶ 3} On September 13, 2024, Hall pleaded not guilty to all charges and specifications, and on April 30, 2025, the case proceeded to a jury trial.

{¶ 4} Prior to the start of trial, the trial judge noted on the record that Hall was dressed in his jail-issued orange jumpsuit rather than available street clothes. When the court asked Hall why he chose to wear the court-issued jumpsuit he responded, "Well, primarily because I would prefer the jury knew I have been locked up for eight months . . . . I'm not trying to hide anything from the jury." Tr. 48. The court, in response, stated:

> Okay. You know what, I don't know that it's about hiding anything from the jury as much as not wanting there to be any prejudice towards you because you are incarcerated. And that's really the primary reason that we encourage or afford defendants that are incarcerated as they proceed with trial to wear street clothes. I wouldn't want anything to influence the jury even though we — I advise them and give them instructions to follow, anything outside of the evidence being presented to weigh in and factor into their verdict. So it is my understanding that there are clothes available and I'll give you the time that you need to change if you've changed your mind.

Tr. 48. Despite the court's suggestion, Hall opted not to change his clothes.

{¶ 5} Defense counsel then made the following statement: "It's certainly against our advice for him to be in orange. I understand the theory behind it and it is not the first occasion in which a client has chosen to demonstrate to jurors that he is indeed incarcerated. Thank you, Judge." Tr. 49.

{¶ 6} At the same time, defense counsel also informed the court that Hall refused to waive his right to a jury trial on the SVP specifications, a decision that was against defense counsel's advice. Defense counsel made the following statement:

> After repeated discussions with our client, he has advised us that he will not sign this waiver, that he wants these specifications to go to the jury. I would like to make a record that this would be strongly against our advice. His failure to sign the waiver is against the advice of counsel. We would like these counts bifurcated and severed so the jury does not hear them. We strongly believe it is prejudicial for the jury to hear them. We do not believe it's in his best interest to have a jury hear these for several reasons, one of which it's highly prejudicial for the jury to know these things and make prejudicial inferences. We also believe that he is innocent and we believe in his innocence, and we do not want the jury to make any adverse determination prior to seeing any evidence.

Tr. 53.

{¶ 7} The trial court informed Hall that presenting the SVP specifications to the jury was highly prejudicial, and Hall responded:

> Yeah. We just disagree. I want the jury to know that I got a past and that's what's being used against me in this case. I want the jury to know I've been in manacles, shackles for eight months. I want the whole truth to come out in the case. I don't want part of the truth or some of the truth. I want all the truth to be on top of things.

Tr. 56.

{¶ 8} During voir dire, the trial court instructed the jury not to draw any conclusions or inferences based upon Hall's attire:

> THE COURT: The presumption of innocence is not a mere formality. Every juror is bound to entertain it sincerely, conscientiously, and ungrudgingly, and give the defendant the full benefit of it.
>
> Additionally, you may have observed or figured out that Mr. Hall is awaiting trial in jail given the fact he is wearing a distinctive orange jail uniform. Sometimes a defendant is able to make bond and other times a defendant is unable to make bond. It appears in this case that Mr. Hall was unable to make bond. But the fact he awaits trial in jail has no bearing on the presumption of innocence. He is presumed innocent the way any person walking in and out of the courtroom doors in a normal suit of clothes would be presumed innocent by you. So the fact that he is garbed in jail attire is in no consideration and no importance and no relevance here. Please do not let it influence you, certainly consciously, but also subconsciously.
>
> Will each of you give the defendant the presumption of innocence that he is entitled?
>
> THE JURORS: Yes.

Tr. 87-88.

{¶ 9} The State introduced trial testimony from the alleged victim, M.A.; eyewitnesses Maya Khawan ("Khawan") and Nadeen Abusada ("Abusada"); Officer Bradley McCormick ("Officer McCormick"); Officer Mariah Rodriguez ("Officer Rodriguez"); social worker Michael Bokmiller ("Bokmiller"); Sexual Assault Nurse Examiner Lewis ("Nurse Lewis"); Hall's sister, Shauna Chadwick ("Chadwick"); Patrolman Samuel Jackson ("Patrolman Jackson"); Detective Marie Clark ("Detective Clark"); and DNA analyst Gerald Furniss ("Furniss"). Against the advice

of his counsel and following the court's advisement of his Fifth Amendment right to remain silent, Hall testified in his own defense.

{¶ 10} M.A. and Hall, who had been in a relationship for 11 years at the time of the incident, offered varying versions of the events that occurred in the early morning hours of August 31, 2024.

**A. M.A.'s testimony**

{¶ 11} According to M.A., she texted Hall after she finished work on Friday, August 30, 2024, and informed him that she planned to stop for a drink before returning to her home where Hall was waiting for her. Hall texted back that he also liked to drink. M.A. testified this response was unusual for Hall, who preferred to socialize at home. Because of Hall's response, M.A. changed her plans; M.A. stopped at her home, and she and Hall headed out together in M.A.'s rental car.

{¶ 12} At McCarthy's, a bar in the Flats, Hall and M.A. had approximately three shots each. According to M.A., Hall proceeded to inform M.A. that he twice planned to have her killed, but he changed his mind before the killing occurred. M.A. walked to the bathroom in tears, returned to the table where Hall was seated, and told him she was ready to go home.

{¶ 13} M.A. testified that she was not frightened to leave McCarthy's with Hall since they had engaged in verbal arguments in the past, and she did not think a physical altercation would occur. When Hall and M.A. were in the car, Hall indicated he was not ready to go home so M.A. agreed to go to another bar. M.A. drove them to McG's where M.A. ordered them shots, but because she was

nauseated, M.A. stepped outside and vomited. While outside, Hall joined M.A. and asked her if she "knew who he [was]" and whispered "that he's a mother-f*!king killer out here in these streets and [M.A. doesn't] know who [she's] dealing with." Tr. 283-284. M.A. testified that a drug dealer named "Cartoon," with whom both she and Hall were familiar, was present at McCarthy's and McG's at the same time as M.A. and Hall.

{¶ 14} M.A. stated that she was not frightened to leave McG's with Hall driving her rental car. According to M.A., Hall drove the rental car "super-fast," and when M.A. asked Hall to slow down, he punched her in the face, twice. M.A. testified that they drove around for a while with blood dripping from M.A.'s face. M.A. testified that Hall parked the vehicle in an area with which she was unfamiliar and declared he wanted "some p[*]ssy." Tr. 285. M.A. stated that she refused Hall and asked him to take her home. Per M.A., Hall exited the vehicle, walked around to the front passenger door, pulled M.A. from the vehicle, and began ripping off her clothing. M.A. further testified that Hall grabbed her by the neck, pushed her into the front passenger seat of the vehicle while Hall stood outside the vehicle, punched her in the face, and told her to perform fellatio. When M.A. refused, Hall allegedly punched her again in the face and told her he would not stop until she performed fellatio. M.A. stated that Hall told her, "His d*ck only gets hard if he sees [her] in pain and that he wasn't going to stop hitting [her] unless [she] sucked his d*ck." Tr. 285.

{¶ 15} M.A. said she consented, and as she was performing fellatio she "bit [his penis] as hard as [she] could because [she] wanted him away from [her.]" Tr. 285. M.A. did not know if she drew blood, but she thought she could have.

{¶ 16} M.A. testified that because of her actions, Hall stepped back from the vehicle, and M.A. crawled over the car console into the driver's seat. M.A. said she was unfamiliar with the rental car and was unable to start the vehicle. M.A. subsequently testified to the following:

> So then he got back in the car and then I took off and I have no idea where we were at. I have no idea what was going on. And then he had — we had stopped [on 58th Street] and he threw the car in park and he got me out the car and got me back in the passenger seat.
>
> And we were just fighting, just back and forth at that point. I'm like — he kept hitting me and I kept trying to hit back. And then finally we got to the street and I rolled the window down because I saw people and I started screaming out the window, Someone help me. I was like, Help me. And this car turned the corner and they told him to stop but by that time, he had grabbed me by my hair and dragged me down the street and left me naked and got back in the car, took off.

Tr. 286.

{¶ 17} M.A. stated that during the above-described events, Hall choked her twice, using one hand to exert pressure under her chin and causing her to lose consciousness more than once. M.A. testified that she did not feel free to leave when she was physically assaulted by Hall and when he told her to perform fellatio.

{¶ 18} According to M.A., two girls encountered her lying naked on West 58th Street, helped cover her body, and waited with her until the ambulance and police arrived. An ambulance transported M.A. to MetroHealth where she was

examined by Nurse Lewis, a sexual assault nurse examiner ("SANE nurse"). M.A. denied the need for a vaginal "sex kit" as part of the examination because no vaginal penetration occurred; M.A. stated that Nurse Lewis performed a strangulation kit.

{¶ 19} M.A. stated that while at the hospital, she called several individuals, including Hall's sister, Chadwick; Chadwick did not answer her call.

{¶ 20} M.A. further testified that she took photographs of herself while at the hospital to depict the injuries she incurred from Hall. The photographs were introduced as trial exhibits and depicted significant facial bruising including two black eyes; scratches on M.A.'s nose and forehead; bruising on her arms, wrists, and leg; and marks on her neck and chin from Hall allegedly choking her. M.A. testified that she suffered a broken nose and broken orbital bone. M.A. further testified that for six weeks her right eye was closed and, because of Hall choking her, she experienced a hoarse voice and difficulty swallowing. M.A. also identified pictures taken approximately one week after the incident that showed bruising on her face and neck and alleged fingerprint marks on her neck. M.A. stated she experienced torn ligaments in her arm although the medical records did not reference such an injury.

{¶ 21} M.A. further testified that she still loved Hall and she missed his presence with her and her children; she stated, "[Hall] was [her] person." Tr. 317. M.A. stated that because of her continued feelings for Hall, she answered several jailhouse calls from him while he was incarcerated although she never initiated a phone call to him. M.A. also sent money to Hall while he was incarcerated. M.A.

could not recall whether she told Hall, during one of the jailhouse calls, that she never told the prosecutor that Hall raped her. Tr. 325. M.A. testified that during one of the jailhouse calls, Hall asked her to request the trial court to lift the no-contact order between them and told her not to speak with the police or prosecutors.

{¶ 22} M.A. denied ever poisoning or drugging Hall.

**B. Khawan's and Abusada's testimony**

{¶ 23} Khawan and Abusada testified about their observations on West 58th Street on the morning of August 31, 2024, and their interactions with M.A.

{¶ 24} As Khawan drove her vehicle down West 58th Street with Abusada as a front-seat passenger, she and Abusada observed a red vehicle — facing the opposite direction of Khawan's vehicle — stopped in the middle of the street with the rear passenger door open.

{¶ 25} Khawan testified that a male dragged an unclothed woman — M.A. — by her hair from the car and onto the street. The male proceeded to kick and punch M.A. until he left the scene in the red vehicle. Abusada testified that she observed the male holding M.A. by her hair and hitting her in the back of her head, with a closed fist. Neither Khawan nor Abusada could identify or describe the man who beat M.A. but Abusada described the physical confrontation:

> It was rage. It was anger. It was — if you could describe someone who could not see in front of them. I'm talking about huge eyes. You can see a clenched jaw. Someone when they're just angry and just going with everything they have in them. Just rage. I will never forget that image.

Tr. 347. Abusada stated that the male threw M.A. to the ground, kicked her, slammed the car door closed, entered the vehicle, and drove away.

{¶ 26} Khawan observed a "decent amount" of blood on M.A.'s face, eyes almost swollen shut, and bruising. Khawan stated that M.A. appeared to be in shock and M.A. said, multiple times, "He just raped the f*!k out of me." Tr. 332. Khawan testified that she asked M.A. who caused her harm, and Khawan thought M.A. said, "[I]t was the father of her child, her daughter or something." Tr. 332. According to Khawan, M.A. stated that she "had just gotten off work" and she and the man had been on a date.

{¶ 27} Abusada stated M.A. wore only a bra and she was bruised and bloodied with a "busted lip." Tr. 344. She described the scene as "horrible." Tr. 344. Abusada recalled that M.A. was hysterical, and she kept saying, "I don't know what I did to deserve this. I don't know. He raped me. He beat me." Tr. 344. Abusada also recalled that M.A. told her she had not seen the man who was the father of her children in a long time, they had been drinking, she did not know how they got to West 58th Street, and the aggressor took M.A.'s rental car.

{¶ 28} Khawan and Abusada called 911 and waited with M.A. until the police and EMS arrived.

**C. Officer McCormick's and Officer Rodriguez's testimony**

{¶ 29} Around 3:00 a.m. on August 31, 2024, Officers McCormick and Rodriguez responded to a call at Aspen Court and West 58th Street in Cleveland, Ohio.

{¶ 30} Upon arrival, Officer Rodriguez observed M.A. on the ground, covered by a sheet, and a vehicle occupied by young females who had been assisting M.A. M.A. had been crying; she had blood on her face, and she was starting to bruise. Officer Rodriguez described M.A. as being "very shaken up" and speaking with a sense of urgency. Tr. 493. According to Officer Rodriguez, M.A. stated that she had been thrown out of a vehicle. Officer Rodriguez rode in the ambulance with M.A. to MetroHealth, and she noticed M.A.'s severe bruising worsened during transport.

{¶ 31} Officer Rodrigez summarized M.A's statements made to her at the hospital:

> [S]he was out drinking with [Hall]. They had pulled into a darker parking lot at some point and he attempted to rape her, kind of ripped her clothes off, things of that nature. And then continued to assault her, mentioned that he enjoyed her being in pain. And she had said along the lines that it had gotten him off. He then drove to [West 58th Street] and dropped her off in the middle of the street.

Tr. 498. Officer Rodriguez testified that M.A. said the beating continued at West 58th Street. M.A. also informed the officer that she bit down on Hall's penis when she performed fellatio to get Hall away from her.

{¶ 32} Officer McCormick testified that he obtained photographs at the hospital that fairly and accurately reflected M.A.'s injuries including bruising on her face, chin, neck, leg, right wrist, and hand and scratches or scrapes on her neck, knee, arm, and elbow.

**D. Michael Bokmiller's testimony**

{¶ 33} Bokmiller, a part-time social worker present at MetroHealth's emergency department on the morning of August 31, 2024, received notification that a strangulation victim who had lost consciousness — M.A. — was being transported to the hospital. Bokmiller could not state who reported that M.A. had lost consciousness. Bokmiller testified that M.A. was sobbing as he spoke with her and, based upon M.A.'s domestic violence allegations, Bokmiller requested the services of Nurse Lewis.

**E. Nurse Lewis's testimony**

{¶ 34} Nurse Lewis, a SANE Nurse, examined M.A. at MetroHealth following M.A.'s alleged encounter with Hall.

{¶ 35} According to Nurse Lewis, M.A. stated the following events occurred at approximately 3:00 a.m. between her and her boyfriend of ten years:

> Patient reported riding in the car with her boyfriend after they had been out. Patient reported he wanted to have sex, but his d[*]ck wouldn't get hard. He started beating me then tried to choke me. He forced his d[*]ck in my mouth and he still did not get hard. He started beating me in the face. . . . He dragged me out of the car and out onto the ground.

Tr. 397. M.A. was unable to complete her narrative because she became too emotional although she later informed Nurse Lewis that Hall had grabbed her with his hands around her neck. M.A. denied to Nurse Lewis that Hall was injured during the assault. Nurse Lewis testified that M.A. provided a coherent, truthful, and clear

narrative of the alleged assault although M.A. was unable to provide a full narrative before she started to cry.

{¶ 36} Nurse Lewis testified that M.A.'s medical records showed she suffered from swelling and bruising of her facial bones, a fractured nose, and traumatic iritis.

{¶ 37} Nurse Lewis stated she did not complete a sexual-assault kit for M.A. because the patient denied vaginal or anal penetration. Nurse Lewis completed a strangulation kit, which required her to secure swabs from M.A.'s neck, because M.A. claimed that she had been choked by Hall. Nurse Lewis stated that M.A. informed her she did not lose consciousness during the alleged strangulation. Based upon M.A.'s allegation that Hall forced her to perform fellatio, Nurse Lewis also obtained two oral swabs from M.A.

{¶ 38} Nurse Lewis wrote the following objective and subjective findings related to the choking claim in M.A.'s medical records: an abrasion, bruising, a laceration or cuts, swollen eyes, puffy face, and a blister. Nurse Lewis noted that the strangulation lasted less than 60 seconds. Nurse Lewis completed a direct visual inspection of M.A.'s entire body and took photographs to document the injuries. The photos, which were shown to the jury, depicted injuries to M.A.'s face, bruising to M.A.'s neck, chin, right breast, right shoulder, right arm, wrist, upper back, right knee, and right shoulder, and swelling of her hands and forearms.

{¶ 39} Nurse Lewis stated the toxicology reports were positive for opiates and negative for alcohol in M.A.'s system. Nurse Lewis further stated that M.A. was administered Fentanyl while in the hospital and that medication could have resulted

in her blood work testing positive for opiates. According to Nurse Lewis, M.A. did not appear intoxicated during her SANE examination. Nurse Lewis stated that the medical records did not document torn ligaments of M.A.'s arms or any other body part because of the alleged assault.

{¶ 40} Nurse Lewis confirmed that M.A.'s medical records, which were introduced as exhibits at trial, contained conflicting statements as to whether M.A. lost consciousness during the assault — social worker Bokmiller's notes indicated a loss of consciousness and Nurse Lewis's notes denied a loss of consciousness.

### F. Patrolman Samuel Jackson's testimony

{¶ 41} M.A. was transported from West 58th Street to MetroHealth around 3:45 a.m. Shortly thereafter, Hall had an interaction with Patrolman Jackson, a member of the Euclid Police Department.

{¶ 42} According to Patrolman Jackson, he responded to an anonymous call around 4:30 a.m. on August 31, 2024, that reported a vehicle stopped in the middle of the road with the driver slumped over the wheel. Upon arrival, Patrolman Jackson observed a Dodge pickup truck parked in the roadway with the engine running, lights on, windows down, and the driver — Hall — slumped over the steering wheel with his foot on the brake. When the responding police officers put the car in gear and removed the keys from the ignition, Hall woke up. Hall's initial verbal responses were incoherent, and he refused to exit his truck. The police officers physically removed Hall from the vehicle; during that time, Hall struck his

head and sustained a gash on his forehead. Patrolman Jackson did not observe blood on Hall before he was removed from his truck.

{¶ 43} Patrolman Jackson testified that Hall smelled strongly of alcohol, he had wet his pants, his eyes were glossy, and he was unable to stand up on his own; Hall's actions indicated to the patrolman that he was "very intoxicated." According to Patrolman Jackson, and as depicted on the Patrolman's body-camera recording, Hall refused to perform standardized field sobriety tests. The body-camera recording showed Hall in a belligerent state during his interactions with Patrolman Jackson.

{¶ 44} Per Patrolman Jackson, an ambulance was called to the scene, and it transported Hall to Euclid Hospital to care for the cut on his forehead. Patrolman Jackson was uncertain whether blood work or a urinalysis was obtained to check Hall's blood-alcohol levels. At the time Hall was transported to the hospital, Patrolman Jackson was unaware of M.A.'s allegations against Hall.

### G. Shauna Chadwick's testimony

{¶ 45} Chadwick, Hall's sister and M.A.'s close friend for over ten years, provided trial testimony pursuant to a subpoena.

{¶ 46} Chadwick testified that Hall called her around 11:00 a.m. on August 31, 2024, and asked that she pick him up from the hospital and take him home. According to Chadwick, Hall stated that he "couldn't remember what was going on, he just needed to get out of there and he just needed a ride." Tr. 457. Chadwick

stated that after she received Hall's call, she remembered that M.A. had called her earlier that morning, but Chadwick had not answered the call.

{¶ 47} Chadwick called M.A., who informed her that M.A. and Hall had engaged in a physical altercation early that morning. M.A. informed Chadwick that she was in the hospital and sent photographs depicting her injuries. Chadwick, a police officer herself, contacted the Cleveland Division of Police and notified the police of her brother's location. Hall was subsequently arrested.

## H. Detective Marie Clark's testimony

{¶ 48} Detective Clark, with the Sex Crimes and Child Abuse Unit of the Cleveland Division of Police, investigated M.A.'s allegations against Hall. Detective Clark initially spoke with M.A. via telephone but found her difficult to understand because she was quiet and had a very hoarse voice.

{¶ 49} Detective Clark obtained a formal in-person statement from M.A., and portions of the video recording of that September 2, 2024 interview were played at trial. The video recording depicted significant bruising on M.A.'s face. Detective Clark testified that during the interview, M.A. was fearful and "very upset." Tr. 569. Detective Clark stated that she obtained M.A.'s medical records that confirmed she had a broken nose, contusions, and bruising following the incident. Detective Clark arranged to tow M.A.'s rental car driven on the night of the incident from M.A.'s home to the impound lot to process the vehicle for DNA.

{¶ 50} Detective Clark also interviewed Hall on September 1, 2024, in the county jail. Detective Clark observed a scratch above Hall's left eye and dried blood

on the crotch area of his pants. She stated that Hall was initially quiet and did not understand why he had been taken to the hospital or why he was incarcerated.

{¶ 51} As to the alleged assault, Hall told Detective Clark that he had been at McCarthy's and McG's with M.A. the prior night. Detective Clark testified that "[Hall] didn't know what happened really after that. He stated that he's a big guy, that if [M.A.] tried to fight him, she probably lost." Tr. 574. Hall also informed Detective Clark that he did not know why he was experiencing blood in his urine and pain in his penis.

{¶ 52} During trial, the State played a jailhouse call that was placed by Hall to an individual identified as "Uncle Junior," within one to two days of Hall's arrest. Detective Clark helped to interpret the conversation and indicated that Hall said M.A. tried to bite off his penis, "that [M.A.] was going crazy[,] and that after [M.A] tried to bite his penis that he blacked out from there." Tr. 579. Hall further stated to Uncle Junior that he did not understand why there were so many charges against him and he did not understand why M.A. did not just say that she "finally caught [him] slipping" and he "kicked [her] ass." Tr. 580. Additionally, Hall said to Uncle Junior that he "couldn't have been too fu*!ed up" because he "didn't kill the b*!ch." Tr. 581. On cross-examination, Detective Clark confirmed that during the conversation between Hall and Uncle Junior, it was stated that "[M.A.] wouldn't admit what she's doing" and "if people found out, that she would lose her kids" but Detective Clark did not know to what the men were referring. Tr. 593.

{¶ 53} Detective Clark further testified that during Hall's incarceration from August 30, 2024, through March 3, 2025, he placed 575 calls to M.A., and M.A. answered 48 of those calls. The jailhouse calls were recorded, and Detective Clark listened to those calls prior to trial. Detective Clark stated that Hall never expressed his concern for M.A.'s well-being during the calls. Detective Clark further testified that M.A. and Hall continued to have telephone conversations after March 3, 2025, and they even spoke after M.A. testified at trial to discuss whether Hall should testify on his own behalf. Detective Clark testified that during the last phone call, Hall did not express that M.A.'s trial testimony was untruthful or inaccurate.

{¶ 54} Detective Clark stated it was obvious through her conversations with M.A. that she still loves Hall — with whom she spent ten years raising M.A.'s children and being financially dependent upon one another — despite the alleged incident that is the basis of this case. Detective Clark further stated that such feelings are not unusual in a domestic violence setting, and Detective Clark has investigated cases of domestic violence where the victim loves and fears the perpetrator.

## I. Gerald Furniss's testimony

{¶ 55} Furniss, a DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory, testified about his DNA testing and findings related to M.A.'s alleged sexual assault.

{¶ 56} Furniss examined five items submitted to the laboratory: (1) sexual-assault evidence collection/ strangulation kit that included oral swabs, neck swabs, and fingernail swabs ("assault kit swabs"), (2) a set of buccal swabs from Hall's

mouth, (3) swabs of suspected blood from the rental car's interior front-passenger door frame, (4) swabs of suspected blood from the rental car's front-passenger seat, and (5) swabs of touch DNA from the rental car's steering wheel. Furniss testified that he followed all scientifically accepted standards and practices when performing the DNA testing and followed the chain-of-custody protocol for the samples.

{¶ 57} Furniss's testing found M.A. and Hall were likely contributors of DNA to the neck swabs and the blood on the steering wheel. The blood found on the interior front-passenger door frame came from M.A., and the blood found on the passenger seat was likely contributed by Hall.

{¶ 58} Furniss stated that no male DNA — seminal fluid or touch DNA — was detected on M.A.'s oral swabs. When cross-examined about whether seminal fluid or touch DNA should have been detected on the oral swabs to support M.A.'s allegation of oral rape, Furniss stated, "Depends on how long after the assault this takes place. The mouth produces a lot of saliva, so DNA might not last as long inside the mouth." Tr. 530.

{¶ 59} Furniss further testified that the amount of DNA deposited in a victim's mouth "as well as degradation and time and whether there was consumption of food or liquids" impact the ability to detect DNA in a victim's mouth. Tr. 537. Furniss stated that in an alleged oral sexual assault as presented in the instant case, "[T]here would most likely be more DNA present if there was seminal material as opposed to just epithelial cells that could come from the man's penis." Tr. 537-538. Furniss also stated that "[d]ue to the large amount of production of

saliva in the mouth, foreign DNA usually gets swallowed or disappears from the mouth. So it doesn't last very long inside the oral cavity." Tr. 537.

## J. Crim.R. 29 Motion for Acquittal

{¶ 60} After the State presented its case-in-chief, Hall moved for a Crim.R. 29 acquittal. The trial court granted the motion on Count 2, rape, and Count 4, attempted rape, which were unopposed, and denied the motion as to all remaining counts.

## K. Hall's Testimony

{¶ 61} Initially, Hall testified that M.A. is addicted to opiates and liquor and she becomes violent when she combines the two substances. Hall maintained he was innocent of the allegations in this case.

{¶ 62} Hall testified that on the morning of Friday, August 30, 2024, he picked up a prescription for M.A. to treat her pink eye that had caused her left eye to swell shut. That evening, M.A. drove them to McCarthy's in her rental car.

{¶ 63} Hall stated that at McCarthy's he and M.A. "finally had a real conversation for, like, the first time in like 11 years." Tr. 633. Per Hall, M.A. introduced him to another patron — "Tune" — who Hall assumed was a drug dealer.[1] Hall testified that M.A. asked him if he had ever thought about having her killed, and he responded — as a joke — "yeah, a few times actually." Tr. 635. When M.A. began to cry, Hall said to her that "thinking about doing something and actually

---

[1] We presume that the person M.A. referred to as "Cartoon" and the person Hall referred to as "Tune" are the same individual.

doing something is two different things." Tr. 635. According to Hall, M.A. then calmed down, and he was ready to go home because he believed M.A. was "really high" from something other than alcohol. Tr. 635.

{¶ 64} Hall testified that he and M.A. left McCarthy's, and he assumed M.A. would drive them home. Hall stated that he fell asleep in the front-passenger seat, and when he woke up, the car was parked outside McG's bar and M.A. was inside the bar. Hall stated that he observed Tune inside the bar, and he believed M.A. had purchased drugs while at McG's. Hall testified that he entered the bar, he and M.A. consumed additional cocktails and Hall fell asleep at the bar; Hall stated that he did not speak with M.A. at McG's. Hall next recalled being in the front-passenger seat of the rental car, with M.A. driving:

> Well, we was rolling — she was happy, you know what I mean? We was outside. We got in the car. She was driving. Again, I'm laying back, you know. She was, like — she like fondled me or whatever, you know. She started out rubbing on my stomach and all that. You know what I mean? She went to fondling and whatnot and I fell asleep.

Tr. 640.

{¶ 65} Hall testified that he next woke up with the car parked outside M.A.'s house and M.A. — dressed only in her bra and undergarments — attempting to perform fellatio. Hall stated that he was disgusted by M.A.'s pinkeye, which he believed was a sexually transmitted disease, and he told her to get off him. According to Hall, rather than leaving him alone, M.A. bit down on his penis "like a Pit Bull" and he had to fight her off and jump out of the vehicle. Tr. 642. Hall

admitted that he pushed M.A. from his lap and he "probably did cause the abrasions on her nose or whatever." Tr. 658.

{¶ 66} Hall testified that he and M.A. proceeded to yell at one another and M.A. eventually drove away. Hall stated that he walked to his truck to have a smoke, entered M.A.'s house to address the wound on his penis, and then left in his truck to drive to his sister Delores's house. Hall further stated that during the drive to Dolores's house he became very tired and confused in his directions because he had been there only a few times before. Hall denied that he was drunk.

{¶ 67} Hall testified that he apparently passed out behind the wheel of his truck, and he recalled waking up to the Euclid police attempting to extricate him from his truck. Hall stated that while they attempted to move him, he "stiffened up" and was difficult to move and, therefore, one of the police officers "sucker punched" him and knocked him out. Hall further stated that when he regained consciousness, he was standing on his feet and bleeding from above his eye. Hall stated that he shouted profanities at the police officer he thought had punched him. Hall denied that he had wet his pants, as testified to by Patrolman Jackson, and he also denied that the police officers asked him to perform any field sobriety tests.

{¶ 68} Hall testified that during his interview with Detective Clark on September 1, 2024, he could not recall all the details of his encounter with M.A. because he had experienced post-traumatic stress after M.A. bit his penis. Hall testified that he was the victim rather than M.A. Hall also denied any knowledge of any events that occurred on West 58th Street because he was not there. Hall further

testified that he was innocent of the pending charges against him; he denied that he forced M.A. to engage in sexual relations or that he transported her somewhere against her will. According to Hall, M.A. was the only one who drove the rental car.

{¶ 69} The following exchange occurred between the assistant prosecuting attorney ("APA") and Hall during Hall's cross-examination:

APA: So [M.A.]'s a real handful, huh?

HALL: Yes. Yeah, she is.

APA: She's a problem, she does the drugs?

HALL: A lot of drugs.

APA: She was so turned on by your comment that you tried to have her killed that she tried to have sex with you in the car?

HALL: She would try to have sex with me right now if she was in here.

APA: And then when that didn't work, she put your penis in her mouth?

HALL: Yes.

APA: And bit it?

HALL: Yes.

Tr. 665.

{¶ 70} Hall attempted to discredit Detective Clark when he testified that she erroneously told people in his neighborhood that he had been convicted of raping a 19-year-old female when in fact he had previously raped a 26-year-old woman and a 23-year-old woman. Hall further testified that Detective Clark and M.A. had prior interactions when M.A. allegedly accused her daughter's biological father of rape.

{¶ 71} Hall also attempted to discredit M.A. when he stated that she had a history of falsely accusing others of criminal behavior. Hall also testified that M.A.'s left eye was swollen shut before the alleged incident because of her pink eye rather than the alleged altercation with him.

{¶ 72} When questioned about the fact that his medical records indicated Hall had alcohol and benzodiazepines in his system, Hall denied that he took any drugs but stated somebody — M.A., her friend, or somebody else — "might have slipped [him] something." Tr. 661.

## L. Trial Proceedings

{¶ 73} After the defense rested, Hall made a renewed Crim.R. 29 motion that the trial court denied.

{¶ 74} On May 6, 2025, the jury returned guilty verdicts on the eight remaining counts: Count 1, rape (fellatio), Count 3, attempted vaginal rape, Counts 5 and 6, kidnapping, Count 7, felonious assault, Counts 8 and 9, strangulation, and Count 10, OVI.

{¶ 75} On the following day, May 7, 2025, the case proceeded to a second phase of the trial, before the same jury, to assess Hall's SVP specifications associated with Counts 1, 3, and 5. The State presented evidence from Detective Clark about Hall's 1999 rape convictions that were based upon two separate incidents where Hall strangled and sexually assaulted the women in his vehicle. Hall served ten years for the convictions, and he was released from prison in 2013. In 2017, Hall was acquitted from charges; the details of the case were not provided. Detective Clark

also testified about a 2019 sexual assault case that allegedly occurred inside a vehicle and for which Hall had not been indicted. The 2019 case was under investigation; the police were attempting to contact the out-of-state victim, who allegedly identified Hall as the perpetrator. Detective Clark stated that the DNA evidence in the 2019 case was a match for Hall. Based upon Detective Clark's testimony, the jury found Hall guilty of the SVP specifications.

{¶ 76} The trial court conducted a sentencing hearing on May 28, 2025. For purposes of sentencing, the court merged Count 6, kidnapping, with Count 5, kidnapping, Count 8, strangulation, with Count 9, strangulation, and imposed the following prison sentence: ten years to life imprisonment on Count 1, rape; 10 years to life imprisonment on Count 5, kidnapping; eight years to life imprisonment on Count 3, attempted rape; eight to 12 years on Count 7, felonious assault; 36 months on Count 9, strangulation; and time served and a $375 fine on Count 10, OVI; with all counts running consecutively to each other. The court classified Hall as a RVO and found the NPC specifications applied.

{¶ 77} On June 2, 2025, Hall filed a notice of appeal, and he now presents seven assignments of error:

> Assignment of error I: The trial court erred in denying appellant's Crim.R. 29 motion for acquittal as the State failed to present sufficient evidence to support a conviction for each offense.
>
> Assignment of error II: Appellant's convictions are against the manifest weight of the evidence, and a new trial is required to prevent a manifest miscarriage of justice.

Assignment of error III: Appellant was denied his constitutional right to the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article I, section 10 of the Ohio Constitution.

Assignment of error IV: The trial court committed reversible error by admitting highly prejudicial and inadmissible evidence of uncharged conduct during the sexually violent predator specification hearing.

Assignment of error V: The trial court erred by refusing to provide jury instructions on lesser-included and inferior offenses supported by the evidence.

Assignment of error VI: The trial court erred at sentencing by failing to merge allied offenses of similar import as required by R.C. 2941.25.

Assignment of error VII: The trial court's imposition of consecutive sentences is contrary to law as the court failed to make the findings required by R.C. 2929.14(C)(4).

## II. Legal Analysis

{¶ 78} Initially, we note that in his first two assignments of error, Hall challenges the sufficiency of the evidence and the weight of the evidence supporting his convictions in Count 1 rape (fellatio), Count 3 attempted vaginal rape, Count 5 kidnapping, Count 7 felonious assault, Count 9 strangulation, and Count 10, OVI. For sentencing purposes, Count 6, kidnapping, merged into Count 5 and Count 8, strangulation, merged into Count 9, and the State elected to proceed with sentencing on Counts 5 and 9. This court has previously found that with merged offenses, if there is sufficient evidence to support the offense on which the State elected to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence or manifest weight of the evidence on the merged counts because any error would constitute harmless error. *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th

Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990), and *Ramos* at ¶ 15, citing *State v. Worley*, 2016-Ohio-2722, ¶ 23 (8th Dist.). Thus, pursuant to *Ramos*, we will not consider Counts 6 and 8 in our evaluation of the sufficiency-of-the-evidence and the manifest-weight-of-the-evidence assigned errors.

**A. Sufficiency of the Evidence**

{¶ 79} In his first assignment of error, Hall argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal because there was insufficient evidence to support convictions for rape, attempted rape, kidnapping, felonious assault, strangulation, and OVI.

{¶ 80} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the State has met its burden of production at trial is conducted. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 33. An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at ¶ 36. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.*

{¶ 81} In a sufficiency inquiry, we also assume the State's witnesses testified truthfully and evaluate whether that testimony, along with any other evidence introduced at trial, satisfies each element of the offense. *In re D.R.S.*, 2016-Ohio-3262, ¶ 23 (8th Dist.). The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991).

## 1. Rape Conviction

{¶ 82} Hall argues that because no seminal fluid or male touch DNA was detected on M.A.'s oral swabs that were obtained following the alleged rape, the scientific evidence directly contradicted the rape allegation. Hall also argues that there was no evidence of penetration — except for M.A.'s uncorroborated testimony — and, thus, there was legally insufficient evidence to sustain the rape charge.

{¶ 83} Hall was charged with rape pursuant to R.C. 2907.02(A)(2), which states, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."[2] Sexual conduct is defined as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

---

[2] Hall was indicted on Count 1, rape, pursuant to R.C. 2907.02(A)(2), and Count 2, rape, pursuant to R.C. 2907.02(A)(1)(a). The trial court granted Hall's Crim.R. 29 motion to acquit on Count 2 and, thus, the only rape charge on appeal is Count 1.

R.C. 2907.01(A).

{¶ 84} Hall appears to believe that fellatio, the alleged sexual conduct that is the basis for his rape charge, requires penetration. We disagree.

{¶ 85} The statutory definition of "sexual conduct" requires penetration to prove vaginal or anal intercourse, but not to prove fellatio or cunnilingus. *State v. Garner*, 2008-Ohio-1949, ¶ 27 (8th Dist.); R.C. 2907.01(A). Fellatio is "'[a] sexual act in which the mouth or lips come into contact with the penis.'" *Garner* at ¶ 28, quoting *Black's Law Dictionary* (6th Ed. 1990). "[C]ourts have previously held that 'fellatio is committed by touching the male sex organ with any part of the mouth.'" *Garner* at ¶ 28, quoting *State v. Long*, 64 Ohio App.3d 615, 618 (9th Dist. 1989).

{¶ 86} Here, M.A. testified that Hall struck her with his fist and told her he would continue to strike her until she performed fellatio. M.A. testified that because of Hall's threats, she put his penis in her mouth and then bit him. Hall denied that he struck M.A. or demanded she perform fellatio, but Hall conceded that M.A. placed his penis in her mouth and then bit down on it. M.A.'s testimony satisfied the elements of rape.

{¶ 87} While Hall correctly states that no one corroborated M.A.'s testimony, no such testimony was necessary: "'Ohio courts have held that the testimony of one witness, if believed by the jury, is sufficient to support a conviction.'" *State v. Barnes*, 2020-Ohio-1534, ¶ 21 (6th Dist.), quoting *State v. Bartulica*, 2018-Ohio-3978, ¶ 43 (6th Dist.), quoting *State v. Williams*, 2017-Ohio-803, ¶ 54 (5th Dist.).

**{¶ 88}** Additionally, we do not agree with Hall's assertion that the absence of Hall's DNA on M.A.'s oral swabs disproved fellatio occurred. Hall states, "The act of biting, especially with the force described and which Hall testified caused him to bleed, would necessarily result in a transfer of epithelial cells, saliva, and potentially blood." Appellant's brief, p. 9. There is no trial testimony supporting this statement. In contrast, the DNA analyst, Furniss, stated touch DNA or seminal fluid DNA might be present following fellatio depending upon how long after the assault the swabs were collected. Furniss also stated that foreign DNA is often swallowed or disappears on the mouth. The scientific evidence did not contradict M.A.'s testimony.

**{¶ 89}** Nor do the cases cited by Hall — *State v. Lee*, 2004-Ohio-5540 (10th Dist.), and *In re J.S.,* 2015-Ohio-4990 (8th Dist.) — support his claim that a complaining witness's bare allegation of fellatio, which is not scientifically substantiated, is insufficient evidence on a rape charge. *Lee* was a homicide case and, therefore, no victim testimony was provided. Similarly, the victim in *In re J.S.* provided no testimony about penetration and, thus, the court found there was insufficient evidence to support a rape conviction. Here, M.A. testified that she engaged in fellatio with Hall under Hall's threat of continued physical abuse.

**{¶ 90}** M.A.'s trial testimony was sufficient to support the rape charge and overcome Hall's Crim.R. 29 motion for acquittal.

## 2. Attempted Rape

{¶ 91} Hall argues there was insufficient evidence to support a conviction of attempted rape. Specifically, Hall argues that M.A.'s testimony that Hall could not achieve an erection contradicts her allegation that Hall tried to vaginally rape her. Hall also argues that the State failed to demonstrate he took a substantial step towards the commission of vaginal rape.

{¶ 92} To convict a defendant of attempted rape, the factfinder must "find, beyond a reasonable doubt, that the defendant engaged in conduct which, if successful, would have resulted in [sexual conduct]." *State v. Robinson*, 1995 Ohio App. LEXIS 1020, 7 (9th Dist. Mar. 15, 1995), citing R.C. 2923.02. Further, a conviction for attempted rape requires a factfinder to find beyond a reasonable doubt that the wrongdoer took a "substantial step" towards committing the rape. *State v. Henderson*, 39 Ohio St.3d 24, 27 (1988), citing *State v. Woods*, 48 Ohio St.2d 127 (1976). A "substantial step" requires conduct that is "'strongly corroborative of the actor's criminal purpose' to constitute a substantial step toward the act, but need not be the last proximate act prior to the commission of the offense." *Woods* at paragraph one of the syllabus. "This standard directs attention to overt acts of the defendant that 'convincingly demonstrate' the defendant's firm purpose to commit the offense." *Id*. at 132.

{¶ 93} "While removing the victim's clothing can amount to a 'substantial step' toward the commission of rape, a defendant cannot be convicted of attempted rape solely on evidence that he removed the victim's clothing." *State v. Brown*,

2013-Ohio-1982, ¶ 18 (8th Dist.), quoting *State v. Davis*, 76 Ohio St.3d 107, 114 (1996). In *Brown*, this court analyzed several cases in determining whether the accused took substantial steps towards committing attempted rape:

> In *State v. Heinish*, 50 Ohio St.3d 231, 553 N.E.2d 1026 (1990), the Ohio Supreme Court found evidence of a victim's pants being pulled down and her blouse opened, without more, to be insufficient to convict a defendant of attempted rape. In *State v. Powell*, 49 Ohio St.3d 255, 552 N.E.2d 191 (1990), the court found a defendant's order for the victim to undress was strongly corroborative of his intent to rape her because he confessed he was going to have sex with her. In *State v. Lucas*, 5th Dist. No. 2005AP090063, 2006 Ohio 1675, the Fifth District Court of Appeals upheld a conviction for attempted rape where the victim was knocked to the floor and the defendant, pulling on the victim's pants, stated, "the pants are coming off." *Id*. at ¶ 23. The defendant had his own pants down around his ankles at the time, was not wearing underwear and at one point was laying on top of the victim. *Id*. at ¶ 24. The Fifth District held that, "[the] act of lying on the victim with his genitals exposed to her vaginal area while attempting to pull off her pants was a 'substantial step' to rape." *Id*. at ¶ 27.
>
> This court vacated a defendant's conviction for attempted rape in *State v. Jones*, 8th Dist. No. 82978, 2004 Ohio 512, where the defendant ordered the victim to remove her clothes at knife-point before fleeing when the victim called 911. We held that the record contained no evidence that the defendant attempted to engage in sexual conduct with the victim or that he expressed an intent to do so. *Id*. at ¶ 24. We stated, "[t]here were no 'sexual advances' toward [the victim] and no evidence that [the defendant] performed an 'overt act,' such as unzipping his pants or removing his clothes, that would indicate his intent to rape her." *Id*. at ¶ 24.

*Brown* at ¶ 19-20.

{¶ 94} M.A.'s testimony was sufficient to demonstrate Hall committed attempted rape. Hall allegedly struck M.A. in the vehicle, demanded vaginal sex, dragged M.A. from the vehicle, and ripped off her clothing. Khawam, Abusada, and Officer Rodriguez corroborated the fact that M.A. was found on West 58th Street

wearing nothing except her bra. The record contains evidence that, when viewed in a light most favorable to the prosecution, shows that (1) Hall engaged in conduct that, if successful, would have resulted in sexual conduct because Hall purposefully compelled M.A. to submit by force or threat of force and (2) Hall took a substantial step towards committing vaginal rape.

## 3. Kidnapping

{¶ 95} The kidnapping charge in violation of R.C. 2905.01(A)(4) was similarly supported by sufficient evidence. R.C. 2905.01(A)(4) provides:

> (A) No person, by force, threat, or deception, . . . by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> . . .
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will. . .

Sexual conduct, sexual contact, or both constitute sexual activity. R.C. 2907.01(C).

{¶ 96} Hall argues there was insufficient evidence to support the kidnapping charge and that because M.A. left McCarthy's with Hall — after he supposedly told her he had intended to have her killed — this act "[broke] any chain of force or threat." Appellate brief, p. 12. Hall further contends that the lack of DNA evidence of a sexual assault disproves a sexual assault occurred and, therefore, no restraint occurred. Hall fails to cite any case law in support of these arguments, and we find that Hall's arguments are misguided.

{¶ 97} "R.C. 2905.01(A)(4) requires only that the restraint or removal occur for the purpose of nonconsensual sexual activity, not that sexual activity actually take place." *Brown,* 2013-Ohio-1982 at ¶ 24 (8th Dist.), citing *State v. Fischer*, 1999 Ohio App. LEXIS 5568 (8th Dist. Nov. 24, 1999), citing *State v. Powell*, 49 Ohio St.3d 255 (1990).

{¶ 98} As addressed above, the State provided sufficient evidence of Hall's intent to engage in sexual activity with M.A. Also, M.A. testified that during the alleged rape and attempted rape, when Hall allegedly struck and choked her, M.A. asked Hall to take her home and he refused. Further, M.A. testified that she did not believe she was free to leave during the felonious assault and attempted rape. A rational trier of the fact could have found this testimony, viewed in a light most favorable to the State, could have proven the essential elements of kidnapping beyond a reasonable doubt.

### 4. Felonious Assault and Strangulation

{¶ 99} Hall argues that the trial court erred when it denied his Crim.R. 29 motion to acquit on Count 7, felonious assault in violation of R.C. 2903.11(A)(1), and Count 9, strangulation in violation of R.C. 2903.18(B)(2). Specifically, Hall contends that the State did not provide sufficient evidence to prove he was the individual who harmed M.A. Hall also contends that he did not knowingly cause serious physical harm to M.A. but merely reacted and defended himself when she bit his penis. Hall further contends that the evidence is inconsistent as to whether M.A. lost consciousness when she was allegedly choked.

## (a) Felonious assault

{¶ 100} As to the felonious assault charge, the State had to prove that Hall knowingly caused serious physical harm to M.A. R.C. 2903.11(A)(1). Serious physical harm to a person is defined as:

> (a)Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b)Any physical harm that carries a substantial risk of death;
>
> (c)Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d)Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e)Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶ 101} M.A. testified that because of the altercations with Hall, she suffered a broken nose, and Nurse Lewis corroborated that M.A. sustained a broken nose. This court has found that "a broken nose is sufficient to constitute serious physical harm." *State v. Noah*, 2022-Ohio-1315, ¶ 10 (8th Dist.), citing *State v. Daniels*, 14 Ohio App.3d 41 (1st Dist. 1984).

{¶ 102} Hall now contends that he used force only to defend himself after M.A. bit his penis, but M.A. testified that Hall struck her numerous times before and after the act of fellatio.

{¶ 103} The testimony provided sufficient evidence to demonstrate that Hall knowingly caused serious physical harm to M.A.

**(b) Strangulation**

{¶ 104} The strangulation charges required the State to prove that Hall knowingly "[c]reate[d] a substantial risk of serious physical harm to another by means of strangulation or suffocation." R.C. 2903.18(B)(2). A person acts "knowingly" when the person "is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22. A "substantial risk" is defined in R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." Serious physical harm to a person includes "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e). Serious physical harm also includes loss of consciousness. *State v. Chambers*, 2014-Ohio-390, ¶ 23 (8th Dist.).

{¶ 105} M.A. testified that Hall choked her several times, she lost consciousness at least once, and she experienced a hoarse, sore throat for almost six weeks that adversely affected her ability to eat and drink. The medical records note marks on M.A.'s chin and throat, and based upon M.A.'s complaints at the hospital, Nurse Lewis completed a strangulation kit.

{¶ 106} Here, M.A.'s testimony provided sufficient evidence for the trier of fact to find that Hall committed strangulation and to defeat Hall's Crim.R. 29 motion to acquit.

**5. OVI**

{¶ 107} Hall argues that the State failed to introduce evidence that he had operated his vehicle before the police discovered him sleeping at the wheel of his truck. Specifically, Hall contends that the State proved only "physical control" of his stationary truck — meaning he was in the driver's seat with possession of the keys — rather than operation of the vehicle or driving.

{¶ 108} Hall's indictment charged him with OVI in violation of R.C. 4511.19(A)(1)(a). The statute provides:

> (1) No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply:
>
> (a) The person is under the influence of alcohol, a drug of abuse, or a combination of them.

R.C. 4511.19(A)(1)(a). "'Operate' means to cause or have caused movement of a vehicle . . . ." R.C. 4511.01(HHH).

{¶ 109} Both M.A. and Hall testified that they drank multiple shots throughout the evening. Hall stated that at McCarthy's he had a beer and three rounds of double shots and "nursed" another drink at McG's. Patrolman Jackson testified that he believed Hall was "very intoxicated" because Hall smelled strongly of alcohol, his eyes were glossy, he had wet his pants, and he was unable to stand up

on his own. The testimony also indicated that Hall tested positive for alcohol and benzodiazepines after the police found him in his truck and transported him to the hospital. While Hall testified that he was not drunk when the police found him sleeping in his truck, a rational trier of fact could have found he was under the influence of alcohol or drugs.

{¶ 110} As to operating a vehicle, Hall testified that he left M.A.'s house in his truck, and he headed to his sister Delores's house. Hall further testified that on the way to Delores's house he became confused about the directions and he got sleepy. Again, a rational trier of fact could have found Hall operated his truck before the police found his car stopped in the middle of the road with Hall sleeping behind the wheel.

## 6. RVO, NPC, and SVP Specifications

{¶ 111} Hall argues the insufficiency of the evidence on the underlying felony counts was fatal to the specifications associated with those counts. As stated in the above analysis, the State introduced sufficient evidence on the underlying felonies and, therefore, this argument is without merit.

{¶ 112} Hall also argues that the State did not demonstrate he was likely to engage in the future in sexually violent offenses and, thus, insufficient evidence was introduced to support the SVP specifications.

{¶ 113} R.C. 2971.01(H)(1) defines an SVP as one "who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." In other words, a defendant may be labeled an

SVP where three factors exist: (1) the offense occurred on or after January 1, 1997, (2) the defendant committed a sexually violent offense, and (3) it is likely that the defendant will engage in at least one more sexually violent offense in the future. The key inquiry to classify a defendant as an SVP is whether the person is likely to engage in a sexually violent offense in the future.

{¶ 114} R.C. 2971.01(H)(2) provides factors to consider when determining a defendant's likelihood to engage in a sexually violent offense in the future:

> (2) For purposes of division (H)(1) of this section, any of the following factors may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:
>
> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
>
> (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
>
> (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
>
> (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
>
> (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
>
> (f) Any other relevant evidence.

"Unlike R.C. 2971.01(H)(1), which requires the existence of the three factors, R.C. 2971.01(H)(2) merely contains factors that may be considered as evidence indicating a likelihood that the person will engage in a sexually violent offense in the future." *State v. Belle*, 2019-Ohio-787, ¶ 36 (8th Dist.), citing *State v. Wooten*, 2014-Ohio-3980, ¶ 36 (9th Dist.). The trier of fact may also consider "any other relevant evidence" as provided in R.C. 2971.01(H)(2)(f).

{¶ 115} At trial, Hall testified to and the State presented evidence that Hall was convicted and sentenced to two rapes that occurred in 1999. In both instances, the victim was taken by Hall, driven in an automobile, strangled, and sexually assaulted in the vehicle. Hall was convicted and sentenced in the 1999 case. Detective Clark also testified to a 2019 sexual assault case that had similar facts to the instant matter and in which the victim allegedly identified Hall as the perpetrator. Detective Clark stated that the DNA analysis in the 2019 case showed a "preliminary match" for Hall's DNA, but the police were attempting to contact the victim who had moved out of state. The 2019 case was held in abeyance, and Hall has not been indicted.

{¶ 116} Thus, there was compelling evidence in the record for the trier of fact to find that Hall was likely to engage in a sexually violent offense in the future under R.C. 2971.01(H)(2). Accordingly, his conviction for the SVP specifications was supported by sufficient evidence.

{¶ 117} For the foregoing reasons, Hall's first assignment of error is overruled.

**B. Manifest Weight of the Evidence**

{¶ 118} In his second assignment of error, Hall argues his convictions were against the manifest weight of the evidence.

{¶ 119} A manifest-weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 1997-Ohio-52 at ¶ 24; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at ¶ 33. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at ¶ 25, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*.

{¶ 120} Hall argues that the jury verdicts were against the manifest weight of the evidence because (1) M.A. and Hall provided "two irreconcilable narratives," and the jury chose to believe M.A., who was not believable, rather than Hall who provided a "coherent, alternative explanation of events," (2) the absence of blood or

semen present on M.A.'s person contradicted M.A.'s allegations, and (3) the lay witnesses could not identify Hall.

{¶ 121} A conviction may rest solely on the testimony of the victim, if believed, and the victim's testimony need not be corroborated to be believed. *State v. Flores-Santiago*, 2020-Ohio-1274 ¶ 38 (8th Dist.); *See also State v. Robinson*, 2014-Ohio-1624, ¶ 12 (8th Dist. ), quoting *State v. Johnson*, 2014-Ohio-494, ¶ 52 (8th Dist. ) ("'Even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable [factfinder] could find the eyewitness testimony to be credible.'").

{¶ 122} Further, "'the decision whether, and to what extent, to credit the testimony of a particular witness is within the peculiar competence of the fact-finder, who has seen and heard the witness.'" *Johnson* at ¶ 54. "'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.'" *State v. Robinson,* 2013-Ohio-4375, ¶ 56 (8th Dist.), quoting *State v. Lawson*, 1997 Ohio App. LEXIS 3709 (2d Dist. Aug. 22, 1997).

> Regarding this presumption in favor of the finder of fact, the Ohio Supreme Court explained:  "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.  In determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the findings of fact. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to

give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*State v. York*, 2021-Ohio-1591, ¶ 94 (8th Dist.), quoting *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 21, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984).

{¶ 123} Also, physical evidence is not required to sustain a conviction against a manifest-weight challenge. *See, e.g., State v. Robertson*, 2018-Ohio-2934, ¶ 32 (8th Dist.) ("[A] lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence.").

{¶ 124} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the witnesses' credibility and deferring to the trier of fact's credibility assessment, we are unable to conclude that the jury lost its way and created a manifest injustice. The jury was in the best position to weigh the credibility of the witnesses and was free to believe some, all, or none of M.A.'s testimony about Hall's conduct. The jury found Hall guilty of all charges and, thus, found M.A. credible. Additionally, the jury found the scientific evidence, which did not contradict M.A.'s testimony, supported or at least did not discredit M.A.'s testimony. Hall's convictions are not against the manifest weight of the evidence simply because the jury chose to believe M.A.'s version of the events rather than the appellant's story. *See State v. Nelson*, 2017-Ohio-5568, ¶ 58 (8th Dist.).

{¶ 125} Based upon the record before us, we find that there was sufficient, competent, credible evidence to support Hall's convictions beyond a reasonable

doubt. We decline to substitute our judgment for the trier of fact regarding the credibility of the witnesses or the weight to be given to their testimony. Consequently, we find that Hall's convictions are not against the manifest weight of the evidence and his second assignment of error is overruled.

## C. Ineffective Assistance of Counsel

{¶ 126} In his third assignment of error, Hall argues that his convictions must be reversed because he received ineffective assistance of counsel. Specifically, Hall argues that his counsel was ineffective because (1) counsel failed to have Hall wear street clothes rather than the jail-issued uniform during trial, (2) counsel failed to assert the defense of involuntary intoxication, and (3) counsel did not seek dismissal of the SVP specification associated with Count 5, kidnapping.

{¶ 127} Ohio Const. art. 1, § 10 and U.S. Const. amend. VI provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

{¶ 128} To establish ineffective assistance of counsel, Hall must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced him so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland* at 687. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 2000-Ohio-448, ¶ 49, citing *Strickland* at 697.

## 1. Jail-Issued Clothing

{¶ 129} Defense counsel advised Hall not to wear the jail-issued orange uniform.  The trial court advised Hall, in open court, not to wear the jail-issued clothing and stated such behavior may be prejudicial.  Hall chose not to follow the advice of his counsel or the trial court and now contends defense counsel's "inability to manage their client" was "a dereliction of their duty."  Hall's claim is without merit.

## 2. Involuntary Intoxication

{¶ 130} Hall argues defense counsel should have asserted the defense of involuntary intoxication because benzodiazepines were found in his system and he denied taking any drugs.  Hall testified that M.A., her friend, or somebody else may have "slipped" him something, although he admitted that he "[had] no clue" who would have drugged him. Tr. 662.  Hall argues there was sufficient evidence — such as his falling asleep at McG's and in M.A.'s car and his inability to recollect details of the evening — to support the defense of involuntary intoxication.

{¶ 131} Hall was unable to state who or when someone might have secretly placed benzodiazepines in his drinks on the day in question.  The jury heard Hall's testimony, including his statements that he did not consume any drugs, but found Hall guilty of all offenses.  Hall cannot show that the jury verdict would have been different if his counsel had presented an involuntary intoxication defense and, accordingly, he cannot satisfy the second prong of the *Strickland* test.

{¶ 132} Further, defense counsel's decision not to pursue an involuntary intoxication defense may have been a trial tactic. "'"Debatable trial tactics do not establish ineffective assistance of counsel."'" *State v. Sims*, 2021-Ohio-4009, ¶ 22 (8th Dist.), quoting, *State v. Snyder*, 2009-Ohio-2473, ¶ 32 (5th Dist.), quoting *State v. Hoffner*, 2004-Ohio-3430, ¶ 45. For the foregoing reasons, Hall's claim regarding the involuntary intoxication defense lacks merit.

**3. SVP Specification**

{¶ 133} Hall argues his defense counsel were ineffective when they failed to seek dismissal of the SVP specification associated with the kidnapping charge. Specifically, Hall argues that R.C. 2941.148 requires the inclusion of a sexual motivation specification under the indictment's Count 5, kidnapping. Absent a sexual motivation specification, Hall could not be convicted as an SVP on the kidnapping charge, and the trial court committed plain error when it convicted Hall on that specification.

{¶ 134} The purpose of an indictment is to notify the offender of the charges brought against him. *State v. Buehner*, 2006-Ohio-4707, ¶ 7, citing *Weaver v. Sacks*, 173 Ohio St. 415, 417 (1962). "'An indictment meets constitutional requirements if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."'" *Buehner* at ¶ 9 , quoting *State v. Childs*, 2000-Ohio-425, ¶ 34, quoting *Hamling v. United States*, 418 U.S. 87, 117-118 (1974).

{¶ 135} The indictment on Count 5, kidnapping, notified Hall that he was charged with kidnapping for the purpose of engaging in sexual activity and, accordingly, Hall was notified of the charges of sexual motivation. The court did not err when it sentenced Hall as an SVP on the kidnapping charge. *See* R.C. 2941.148(A)(1)(a) and (d).

## 4. Criminal History

{¶ 136} Hall also suggests he experienced prejudice by his counsel's deficient performance because the jurors heard testimony about his criminal history. Hall was cautioned by the court and advised by defense counsel about the risks associated with testifying on his own behalf and choosing not to waive a jury trial on his SVP specifications. Hall ignored those advisements. Hall's testimony included statements about his past rape convictions. Further, during the second phase of trial, the State introduced evidence about Hall's 1999 rape convictions and the 2019 sexual assault case with facts similar to those in the instant matter. We cannot find that Hall was prejudiced by the ineffective assistance of counsel where Hall's failure to follow his counsel's recommendations led to the alleged prejudice.

{¶ 137} For the foregoing reasons, defense counsel did not demonstrate ineffective assistance of counsel, and Hall's third assignment of error is overruled.

## D. Inadmissible Evidence

{¶ 138} In his fourth assignment of error, Hall contends that the trial court acted in derogation of Evid.R. 403 when it allowed the State to introduce testimony during the SVP-specification phase of his trial. Specifically, the jury heard testimony

about a prior 2017 case in which Hall was acquitted and uncharged allegations from a 2019 incident.

{¶ 139} Initially, we note that the Ohio Rules of Evidence do not strictly apply to sexual predator classification hearings and, accordingly, we need not assess the application of Evid.R. 403 to this proceeding. *State v. Cook*, 83 Ohio St. 3d 404, 425 (1998) (*overruled on other grounds*).

{¶ 140} "In order for an offender to be classified a sexual predator, the State of Ohio must prove by clear and convincing evidence that the offender has been convicted of a sexually oriented offense and that the offender is likely to engage in the future in one or more sexually oriented offenses." *State v. Irvin*, 2007-Ohio-5328, ¶ 7 (8th Dist.), citing *State v. Eppinger*, 2001-Ohio-247, ¶ 23.

{¶ 141} R.C. 2971.01(H)(2) provides a nonexclusive list of factors that the trier of fact "may" use in determining that a defendant is likely to engage in sexually violent offenses in the future.

{¶ 142} The trier of fact is free to consider "any other relevant evidence" as provided in the catchall provision of R.C. 2971.01(H)(2)(f). *Belle*, 2019-Ohio-787 at ¶ 36, quoting *State v. T.E.H.*, 2017-Ohio-4140, ¶ 72 (10th Dist.), citing *State v. Sylvester*, 2016-Ohio-5710, ¶ 12-13 (8th Dist.). "Any other relevant evidence," as specified in R.C. 2971.01(H)(2)(f) may include the current indictment or charges for which a defendant is not found guilty. *State v. Bey*, 2025-Ohio-740, ¶ 60 (8th Dist.), and ¶ 66, citing *State v. Rodriguez*, 2021-Ohio-2580, ¶ 18 (8th Dist.). "Evidence sufficient to support even one of the factors listed in R.C. 2971.01(H)(2) is enough

to affirm the [trier of fact's] finding that a defendant is a sexually violent predator pursuant to R.C. 2971.01(H)(1)." *State v. Stacy*, 2024-Ohio-4539, ¶ 99 (11th Dist.), quoting *T.E.H.*

{¶ 143} Here, during the SVP specification portion of Hall's trial, the jury properly considered testimony about Hall's 1999 rape convictions, a 2017 case where Hall was acquitted, and a pending 2019 incident that had facts similar to the instant matter and where the preliminary DNA and victim identification linked Hall to the offenses. For the foregoing reasons, Hall's fourth assignment of error is overruled.

**E. Jury Instructions**

{¶ 144} Hall's fifth assigned error contends that the trial court erred when it failed to instruct the jury on unlawful restraint — the lesser-included offense of kidnapping — and aggravated assault — an inferior offense of felonious assault.

{¶ 145} When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Owens*, 2012-Ohio-5887, ¶ 11 (8th Dist.).

{¶ 146} This court has stated that

> [g]enerally, "a charge on a lesser-included or inferior offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included or inferior offense." *State v. Carter*, 2018-Ohio-3671, 119 N.E.3d 896, ¶ 59 (8th Dist.), citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. In determining whether a lesser-included or inferior offense instruction is

appropriate, the trial court must view the evidence in the light most favorable to the defendant. *Id.* at ¶ 59, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37. An instruction is not warranted, however, every time "some evidence" is presented on a lesser-included or inferior offense. *State v. Smith*, 8th Dist. Cuyahoga No. 90478, 2009-Ohio-2244, ¶ 12, citing *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992).

*State v. Lloyd*, 2021-Ohio-1808, ¶ 25 (8th Dist.).

{¶ 147} "If in a criminal case the evidence adduced on behalf of the defense is such that if accepted by the trier of the facts it would constitute a complete defense to all substantive elements of the crime charged, the trier will not be permitted to consider a lesser included offense." *State v. Nolton*, 19 Ohio St.2d 133 (1969), syllabus. Similarly, "'[w]here a defendant interposes a complete defense to the charged crime, a lesser [or inferior] offense consideration is inappropriate.'" *State v. Masci*, 2012-Ohio-359, ¶ 25 (8th Dist.), quoting *State v. Leibold*, 1993 Ohio App. LEXIS 1419, (8th Dist. Mar. 11, 1993), citing *State v. Solomon*, 66 Ohio St.2d 214, 221 (1981).

{¶ 148} Hall contends that the court should have instructed the jury on unlawful restraint — the lesser-included offense of kidnapping. The record shows that Hall denied the kidnapping charges throughout trial. Hall's version of the events, if accepted by the jury as true, would have constituted a complete defense to the kidnapping charges. Thus, he was not entitled to a jury instruction on the lesser-included offense of unlawful restraint.

{¶ 149} Hall also maintained he was innocent of the felonious assault charges. Hall testified that when M.A. bit his penis, he may have caused an abrasion

on her nose, but he never conceded that he caused any of M.A.'s other injuries including her broken nose. Thus, Hall was not entitled to a jury instruction on aggravated assault.

{¶ 150} For the foregoing reasons, we find that Hall's fifth assigned error lacks merit and is overruled.

## F. Allied Offenses of Similar Import

{¶ 151} In his sixth assignment of error, Hall argues that the trial court should have merged Count 1, rape by fellatio, with Count 3, attempted vaginal rape, and, alternatively, the court should have merged Count 3, attempted vaginal rape, Count 5, kidnapping, Count 7, felonious assault, and Count 9, strangulation, into Count 1.

{¶ 152} Appellate courts review whether offenses are allied offenses of similar import under a de novo standard. *State v. Sims*, 2024-Ohio-5699, ¶ 28 (8th Dist.), citing *State v. Williams*, 2012-Ohio-5699, ¶ 28. "'The defendant bears the burden of establishing entitlement to the protection provided by R.C. 2941.25.'" *Id.* at ¶ 86, quoting *State v. Davids*, 2022-Ohio-2272, ¶ 43 (8th Dist.).

{¶ 153} R.C. 2941.25, which governs whether allied offenses of similar import and merger, states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses

of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 154} Courts will consider three separate factors to determine whether the offenses are subject to merger:  the import, the conduct, and the animus.  *Bey*, 2025-Ohio-740, at ¶ 86 (8th Dist.), citing *State v. Ruff*, 2015-Ohio-995, paragraphs one and three of the syllabus.  R.C. 2941.25(A) allows only a single conviction for conduct that constitutes "allied offenses of similar import."  Pursuant to R.C. 2941.25(B), offenses do not merge and a defendant charged with multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.  *Ruff* at ¶ 13, citing *State v. Moss*, 69 Ohio St.2d 515, 519 (1982).

{¶ 155} "Two or more offenses are of dissimilar import within the meaning of R.C. 2941.25(B) 'when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable'" *State v. Asadi-Ousley*, 2017-Ohio-7252, ¶ 42 (8th Dist.), quoting *Ruff* at paragraph two of the syllabus.

{¶ 156} As to animus, this court previously found that

[t]he Ohio Supreme Court has defined the term "animus" to mean "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979).  Because animus is often difficult to prove directly, it may be inferred from the surrounding circumstances.  When "an individual's immediate motive involves the

commission of one offense, but in the course of committing that crime he must, a priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime." *Id.*

Thus, when determining whether two offenses were committed with a separate animus, the court must consider (1) whether the first offense was merely incidental to the second offense or whether the defendant's conduct in the first offense demonstrated a significance independent of the second, and (2) whether the defendant's conduct in the first offense subjected the victim to a substantial increase in the risk of harm apart from that involved in the second offense. *State v. Shields*, 1st Dist. Hamilton No. C-100362, 2011-Ohio-1912, ¶ 17.

*State v. Bailey*, 2014-Ohio-4684, ¶ 34-35 (8th Dist.).

{¶ 157} Hall now argues that the entire incident between him and M.A., from the time he allegedly struck her in the face until he left M.A. on West 58th Street, was a single, continuous course of conduct.[3] Hall further argues his purpose in committing the kidnapping, felonious assault, and strangulation was to facilitate and commit the rape and attempted rape. Because the acts were inextricably intertwined, Hall argues Counts 3, 5, 7, and 9 should have merged into Count 1. We disagree.

{¶ 158} M.A. alleged that after they left McG's, with Hall driving the rental car at a high speed, Hall struck her in the face when she asked him to slow down. Hall and M.A. then "drove around for a while," and M.A. had no idea where they driving. Tr. 284. They stopped in an area that M.A. was not familiar with — there was "grass in front" and behind her were buildings "but it was an enclosed area." Tr. 288. Hall allegedly demanded vaginal sex and ripped off M.A.'s clothing. Hall then

---

[3] We note that at trial, Hall denied he was involved with the events on 58th Street.

grabbed M.A. by her throat, sat her down in the passenger side of the vehicle, punched her, and demanded fellatio. Hall continued to punch M.A. until she performed fellatio. After M.A. bit Hall's penis, he returned to the driver's seat and again took off to an unknown location. They ended up on West 58th Street where Hall dragged M.A. from the car by her hair, fought her, choked her — allegedly to the point of M.A. losing consciousness —and dumped her naked on the street. M.A. testified that she did not feel free to leave when Hall physically assaulted her or when he told her to perform fellatio.

{¶ 159} In our view, the felonious assault conduct involved separate and identifiable harm, apart from A.M.'s kidnapping, strangulation, rape, and attempted rape. Accordingly, we find Hall's felonious assault was an offense of dissimilar import and, therefore, was not an allied offense subject to merger.

{¶ 160} With respect to the offenses of rape and kidnapping, the Supreme Court of Ohio has recognized that "implicit within every forcible rape . . . is a kidnapping" because the victim's liberty is restrained during the act of forcible rape. *State v. Logan*, 60 Ohio St.2d 126, 130 (1979). The *Logan* Court further provided guidelines to determine whether kidnapping and another offense are allied offenses for purposes of merger:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.[4]

{¶ 161} Applying the above guidelines, we find the kidnapping and rape demonstrate a separate animus. M.A. testified that she and Hall drove "for a while" from McG's to an unknown, isolated location where Hall allegedly committed rape and attempted rape. The kidnapping was not incidental to the rape and attempted rape and, thus, the offenses did not merge.

{¶ 162} The strangulation charges arose from incidents at the time of the rape and later on West 58th Street, and the harm from the strangulation was separate and distinct from the rape charges.

{¶ 163} "The law in Ohio is clear that multiple separate and distinct acts of penetration will support multiple convictions and sentences, and oral, anal, and vaginal rapes constitute separate and distinct acts." *State v. Hall*, 2018-Ohio-619, ¶ 10 (6th Dist.), citing *State v. Hernandez*, 2011-Ohio-3765, ¶ 48 (12th Dist.); *State v. Pippin*, 2017-Ohio-6970, ¶ 49 (1st Dist.). Thus, Count 1, rape, and Count 3, attempted rape, should not have merged.

---

4    Although *Logan* predates *Ruff*, Ohio courts continue to apply the *Logan* guidelines to determine whether kidnapping and another offense were committed with a separate animus. *Asadi-Ousley*, 2017-Ohio-7252, at ¶ 47, citing *State v. Armengau*, 2017-Ohio-4452, ¶ 125 (10th Dist.), citing *State v. D.E.M.*, 2016-Ohio-5638, ¶ 143 (10th Dist.).

{¶ 164} For the foregoing reasons, Counts 3, 5, 7, and 9, collectively, or Count 3, individually, should not have merged with Count 1 for sentencing purposes. Hall's sixth assignment of error is overruled.

**G. Consecutive Sentences**

{¶ 165} In his seventh assignment of error, Hall contends that the trial court's imposition of consecutive sentences is contrary to law.

{¶ 166} When reviewing felony sentences, appellate courts apply the standard of review found in R.C. 2953.08(C). *State v. Marcum*, 2016-Ohio-1002, ¶ 9. Under R.C. 2953.08(C)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

{¶ 167} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry," and a failure to do so is contrary to law. *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. The trial court is not "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 168} Thus, trial courts must engage in R.C. 2929.14(C)(4)'s three-tiered analysis before imposing consecutive sentences. *Id.* The trial court must first find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. Next, the trial court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. R.C. 2929.14(C)(4). The trial court must then find that at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 169} A review of the record clearly demonstrates that the trial court engaged in the statutory three-tiered analysis and stated that the terms of R.C. 2929.14(C)(4)(b) applied, before imposing consecutive sentences on Count 7, felonious assault, and Count 9, strangulation. The trial court did not state reasons for its findings, nor was it required to do so. *Bonnell.*

{¶ 170} Hall also argues that his actions were not committed as part of one or more courses of conduct but were the result of "a single action."

{¶ 171} R.C. 2929.14(C)(4)(b) states the offender committed multiple offenses as part of "one" singular course of conduct, resulting in the requisite "harm." "'This language . . . compels the conclusion that a consecutive sentence may be ordered for multiple offenses committed as part of a single course of conduct or for multiple offenses committed during multiple courses of conduct.'" *State v. Colon*, 2022-Ohio-2137, ¶ 15 (8th Dist.), quoting *State v. Tucker*, 2019-Ohio-652, ¶ 32 (2d Dist.) (Tucker, J., concurring).

{¶ 172} "Although Ohio's sentencing statutes do not specifically define 'course of conduct,' the Supreme Court of Ohio has found that a course of conduct may be established by factual links, such as time, location, cause of death, similar motivation, or some connection that ties the offenses together as part of a single course of conduct." *Colon*, citing *State v. Short*, 2011-Ohio-3641, ¶ 144; *State v. Sapp*, 2004-Ohio-7008, syllabus; *see also State v. Squires*, 2021-Ohio-2035, ¶ 11-12 (8th Dist.).

{¶ 173} Here, the record shows that the offenses occurred on August 31, 2024, and involved M.A. and Hall, and these factual links established that the offenses were committed as a single course of conduct. The record also supports the determination that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of the courses of conduct adequately reflects the seriousness of Hall's conduct. The consecutive sentences on Count 7 and Count 9 were not contrary to law.

{¶ 174} Also, because the jury convicted Hall of a sexually violent predator specification, the trial court was required to sentence Hall to consecutive sentences on Counts 1, 3, and 5 pursuant to R.C. 2971.03(E). *See State v. Wilk*, 2022-Ohio-1840, ¶ 74 (8th Dist.).

{¶ 175} For the foregoing reasons, Hall's seventh assignment of error is overruled.

{¶ 176} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

EMANUELLA D. GROVES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR